Jeffrey L. Hartman, Esq., #1607
**HARTMAN & HARTMAN**
510 West Plumb Lane, Suite B
Reno, Nevada 89509
Telephone: 775.324.2800
Fax: 775-324-1818
notices@bankruptcyreno.com

Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

IN RE:                                                             CASE NO.     16-50850-BTB
                                                                   CHAPTER      11
LEAP FORWARD GAMING, INC.,

    Debtor.                                        **(Proposed) DISCLOSURE STATEMENT**
                                                                   **OF LEAP FORWARD GAMING, INC.**

                                                                   **Hearing Date: OST Pending**
_____/                                   **Hearing Time:**

    Leap Forward Gaming, Inc. (the "Debtor"), debtor and debtor in possession, provides this Disclosure Statement in the above-captioned chapter 11 case.

**1.   INTRODUCTION**

    The Debtor is providing this Disclosure Statement (the "Disclosure Statement") to all of the Debtor's known Creditors in connection with the Debtor's Plan of Liquidation (the "Plan"), a copy of which accompanies the Disclosure Statement. The Plan has been developed based upon thorough review and analysis of the Debtor's financial condition, as well as IGT's lawsuit against Debtor which essentially prevents Debtor's assets from being liquidated to a party other than IGT. The Plan provides for use of Pre-Petition Secured Parties' cash collateral to fund employee payroll and operating expenses until the sale of Debtor's assets (primarily IP and inventory) to IGT.  The resulting $2,500,000 cash proceeds from the sale, plus any remaining cash collateral, will be distributed to Pre-Petition Secured Parties as more specifically set forth below. The

1

Debtor believes that the Plan provides fair and equitable treatment of all classes of Creditors and the greatest feasible recovery to Creditors. Accordingly, the Debtor requests that all Creditors in Impaired Classes vote to accept the Plan.

**2. PURPOSE OF DISCLOSURE STATEMENT AND PROCEDURE FOR PLAN CONFIRMATION**

**a. Purpose and General Information**

Pursuant to 11 U.S.C. § 1125 the Debtor submits this Disclosure Statement to provide Creditors with adequate information to allow them to make an informed judgment about the acceptability of the Plan.[1] Specifically, the purpose of this Disclosure Statement is to give Creditors sufficient information, as far as it is reasonably practicable for the Debtor to provide, that would allow a hypothetical reasonable investor typical of the holders of Claims in the classes Impaired under the Plan to make an informed judgment about whether to accept or reject the Plan. A copy of the Plan accompanies this Disclosure Statement. Terms defined in the Plan shall have the same meaning in this Disclosure Statement. Please refer to the Plan for the treatment of Claims. The provisions of the Plan are binding on all Creditors; therefore, please read the Plan carefully.

**NO REPRESENTATIONS ABOUT THE DEBTOR, PARTICULARLY ABOUT THE VALUE OF ITS PROPERTY, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR.**

---

[1] Unless otherwise indicated, all section numbers designated as "§" shall refer to Title 11, United States Code.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ABSOLUTE ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS COMPLETE AND ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT COMPLETE AND ACCURATE INFORMATION. THE RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON INTERNAL BOOKKEEPING. THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY. HOWEVER, EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE INFORMATION. COUNSEL TO THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED ANY OF THE INFORMATION PROVIDED BY THE DEBTOR AND DOES NOT MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE TRUTH OR ACCURACY OF ANY OF THE INFORMATION PRESENTED.**

**ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW IN FULL THE PLAN AND THIS DISCLOSURE STATEMENT TOGETHER WITH ALL EXHIBITS ATTACHED THERETO, PRIOR TO VOTING ON THE PLAN, AND MAY DESIRE TO CONSULT LEGAL COUNSEL PRIOR TO VOTING TO ENSURE COMPLETE UNDERSTANDING OF THEIR TREATMENT UNDER THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION ABOUT THE PLAN.**

**EACH CREDITOR IS URGED TO CONSULT ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS. THE DEBTOR MAKES NO WARRANTIES OR REPRESENTATIONS REGARDING THE TAX IMPACT OF THE PLAN ON ANY CREDITOR OR INTEREST HOLDER.**

**THE DEBTOR BELIEVES THAT THE PLAN IS FEASIBLE, FAIR AND EQUITABLE AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST OF INTERESTS OF CREDITORS.**

b. **Manner of Voting**

(i) **Classes Entitled to Vote**. The Plan divides the Claims of Creditors into three classes. Only classes of Creditors with claims impaired under a plan of liquidation are entitled to vote on a plan. Generally, and subject to the specific provisions of the Bankruptcy Code, this includes creditors whose claims or interests, under a plan, will be modified in terms of principal, interest, length of time for payment, or a combination of the above. Any holder of a Claim in a Class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan, and solicitation of acceptances from the holders of such Claims is not required and will not be undertaken.

All Classes (A, B and C) in this Case are Impaired under the Plan and the members of each of the Impaired Classes are entitled to vote to accept or reject the Plan.

///

///

///

///

**(ii) Procedure For Voting**. All Creditors entitled to vote may cast their vote by completing, dating, and signing the Ballot included with this Disclosure Statement and mailing it to:

> Jeffrey L. Hartman, Esq., #1607
> **HARTMAN & HARTMAN**
> 510 West Plumb Lane, Suite B
> Reno, Nevada 89509
> Telephone: 775.324.2800
> notices@bankruptcyreno.com

**IN ORDER TO BE COUNTED, THE COMPLETED BALLOT MUST BE RECEIVED NO LATER THAN _____. A BALLOT DOES NOT CONSTITUTE A VALID PROOF OF CLAIM IN THE DEBTOR'S CASE.**

    **c.   Confirmation of the Plan**

    **(i) Solicitation of Acceptance of the Plan**. This Disclosure Statement has been approved by the Bankruptcy Court in accordance with § 1125 and has been provided to all Creditors in this Case. This Disclosure Statement is intended to assist Creditors with their evaluation of the Plan and their decision to accept or reject the Plan. Your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement at the time of, or before, such solicitation.

    **(ii) Votes Considered in Determining Acceptance of the Plan.** When acceptance of the Plan is determined by the Bankruptcy Court, in accordance with § 1126 and Federal Rule Of Bankruptcy Procedure 3018, votes of Creditors will only be counted if submitted by Creditors with Allowed Claims who are members of Classes A, B or C. If you are in any way uncertain if, or how, your Claim has been scheduled, you should review the Debtor's schedules and any amendments thereto which are on file with the Clerk's Office of the United States Bankruptcy Court, located at 300 Booth St, Reno, NV 89509 (1st floor).  Votes of Class A, B or C Claim Holders will be counted only if submitted by the holder of record on the date the order of the Court approving the Disclosure Statement is entered.

**(iii) Hearing on Confirmation of the Plan**. The Bankruptcy Court has set a hearing to determine if the Plan has been accepted by the required number of holders of Claims and if other requirements for Confirmation of the Plan have been satisfied. The hearing on Confirmation of the Plan shall commence on _____ in the United States Bankruptcy Court, located at 300 Booth St, Reno, NV 89509 (5th floor). Any objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtor on or before _____.

**(iv) Determining Whether Impaired Classes Have Accepted the Plan.** At the scheduled hearing on Confirmation of the Plan, the Bankruptcy Court must determine, among other things, if the Plan has been accepted by each Impaired Class. Under § 1126(c), an Impaired Class of Claims is deemed to have accepted the Plan if Class members holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of all Allowed Claims of Class members actually voting have voted in favor of the Plan. Further, under § 1129(a)(7)(A)(ii), the Bankruptcy Court must also find that each member of an Impaired Class either votes to accept the Plan or will receive or retain as much under the Plan as the member would receive or retain if the Debtor were liquidated, as of the Effective Date of the Plan, under chapter 7 of the Bankruptcy Code. This is known as the "best interest of creditors' test."

**(v) Confirmation of the Plan Without Consent of all Impaired Classes.** The Plan may be confirmed even if not accepted by all Impaired classes, if the Bankruptcy Court finds that all other requirements of Confirmation under § 1129(a) are satisfied and certain additional conditions are met. These conditions are set forth in §1129(b), and require, generally, a showing that the Plan does not discriminate unfairly and that the Plan is "fair and equitable" with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan. In order to be "fair and equitable" the Plan must provide that Unsecured Creditors in non-consenting, Impaired

classes will either receive or retain on account of their Claims, property of a value, as of the Effective Date of the Plan, at least equal to the value of such Claims or, if they receive less than full value, no Class with a junior priority will receive or retain anything on account of such junior Claim or Interest.  For Secured Creditors, the Plan will be "fair and equitable" under § 1129(b) if Secured Creditors either (i) retain the liens securing their claims and receive deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of the Secured Creditor's interest in such property, (ii) if the property securing their claim is to be sold, their liens will attach to the proceeds, or (iii) Secured Creditors will receive the "indubitable equivalent" of their Secured Claims.  These are complex statutory provisions and this summary is not intended to be a complete statement of the law. If the Plan is not accepted by an Impaired Class or Classes, the Debtor may rely on the "cramdown" provisions of § 1129(b) and seek Confirmation of the Plan.

### 3. THE DEBTOR

#### a. In General

Debtor was incorporated on 1/29/2010, and was initially capitalized by $4,800,000 in equity investments from JCM Global (public company) and Ernest W. Moody Revocable Trust. Debtor's initial business included two segments:

- A wireless communication system (SaffariNet) for slot machines.  By 2012, Debtor began expanding SaffariNet to include picture-in-picture functionality… connected to Bally's un-encrypted player tracking system used by Las Vegas Sands Corp. casinos.  In February 2013, Debtor installed its SaffariNet picture-in-picture functionality in the Sands Macao Casino.
- A 3rd-party game developer for IGT and Aristocrat (public companies).  By 2012, Debtor began winding down this unprofitable business.

In February 2013, LFG installed its SaffariNet picture-in-picture functionality in the Sands Macao Casino. In May 2013, Macquarie Capital provided $10,000,000 in senior secured loans to LFG, and was engaged as LFG's financial advisor. LFG subsequently launched a process to market itself for sale, which resulted in the submission of a letter of intent from a large public company ("Bidder A") on November 15, 2013 for up to $200,000,000. LFG entered into exclusivity with Bidder A, but sale discussions were terminated in January 2104.

In June 2014, LFG installed its SaffariNet picture-in-picture functionality in the MGM Detroit Casino connected to IGT's encrypted player tracking system used by MGM casinos. Per regulators, MGM could not pay LFG until it held a Michigan gaming license. As a result, LFG converted its equity to subordinated loans in December 2014, in order to be licensed and paid in January 2015. In May 2014, November 2014, and May 2015, LFG's lenders provided additional subordinated loans.

In June 2015, a large public company, ("Bidder B") submitted a Letter of Intent to acquire LFG for $18,500,000. Sale discussions with Bidder B terminated in September 2015, concurrent with IGT's lawsuit filing against LFG.

Six months later, in March 2016, IGT submitted a Letter of Intent to acquire LFG for up to $8,500,000.

b. **Factors Precipitating Chapter 11 Filing**

In September 2015, IGT filed a lawsuit against Debtor. As a result of this lawsuit, customer orders were suspended and Debtor's sale discussions with Bidder B were terminated. From September 2015 to Petition Date, Debtor continued to pay payroll and operating costs in order to preserve and maintain Debtor's assets for sale to IGT. This depleted Debtor's remaining cash.

///

8

    c. **Debtor's Recent Financial Results**

Debtor's sales were frozen by its customers, at the time of (and since) IGT's lawsuit filing in September 2015.

    d. **Actions Taken to Improve Operations**

There are no actions Debtor can take to improve operations without first resolving IGT's lawsuit. As discussed below, as a condition of Debtor's negotiated asset sale to IGT, Debtor and IGT will each execute a mutual settlement and release.

    e. **Debtor's Continuing Viability**

As of the Filing Date, Debtor has $616,448 in cash (Pre-Petition Secured Lender's cash collateral) and over $110,000 in monthly payroll and operating expenses. Debtor is not viable.

**4.    MAJOR EVENTS IN CHAPTER 11 CASE**

On July 11, 2016, Debtor filed its Motion For (1) Order Authorizing Sale Of Personal Property Free And Clear Of Liens And Encumbrances, And (2) Order Approving Settlement And Compromise Of Disputed Claims ("Sale Motion"). **DE 10**. The Sale Motion is currently scheduled to be considered by the Court on August 29, 2016 at 2:00 p.m. The Sale Motion contemplates a sale of substantially all of Debtor's assets to IGT and also will result in the settlement and release of disputed claims between the Debtor and IGT.

During the interim period between the Petition Date of July 8, 2016 and the hearing on the Sale Motion, the Debtor's employees consist primarily of engineers who continue to work on product development for products to be acquired by IGT for the benefit of its customers. Importantly, the Prepetition Secured Parties have consented to the use of cash collateral during the interim period of time until the sale to IGT can be approved by the Court. Because the Prepetition Secured Parties hold a perfected security interest in all of the personal property assets

///

owned by LFG, the use of cash collateral will not adversely impact unsecured creditors of the estate.

### 5. SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES

#### a. Assets

Debtor's assets as of Petition Date total approximately $2.5M. Principal assets include:
- Cash and cash equivalents ($616,448)
- Patents and source code ($1,000,000)
- Inventory and deposits on inventory ($817,690)

#### b. Liabilities

Debtor's liabilities as of Petition Date total $26M including (categorized by "Class" as defined in Plan):

**Class A**- Secured loans by Pre-Petition Secured Parties:
- $12,220,822 secured loan (including principal and accrued interest as of the Petition Date)

**Class B**- Priority Claims:

- $62,000 for paid time off and other components under § 507(a)(4).

**Class C**- Unsecured Claims (excluding Pre-Petition Secured Parties),

- $6,883,398 unsecured loan (including principal and accrued interest as of the Petition Date), from Ernest W. Moody Revocable Trust;.
- $1,812,500 customer down payment from Thunder Valley Casino Resort, for a sales order;
- $1,010,982 customer down payment from Venetian Macau Limited, for a sales order;
- $240,000 to Latham & Watkins LLP, for legal services;
- $200,000 unsecured loan from Ali Saffari;
- $116,859 payable to Hitachi High Technologies America, for product shipped prior to Petition Date (vendor would not authorize return);
- $90,000 payable to Darby Bryant ($30,000 annual deferred pay for each of 2013, 2014, 2015);
- $12,000 payable to Ali Saffari for accrued vacation (in excess of $12,800 cap);

- $7,200 payable to Craig Paulsen for unpaid 2015 bonus (in excess of $12,800 cap);
- $3,214,413 unsecured loan (including principal and accrued interest as of the Petition Date)

## 6. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### a. Alternative Plans of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor (or, if the Debtor's exclusive periods in which to file and solicit acceptances of a plan of reorganization have expired, any other party in interest) could attempt to formulate and propose a different plan. Such a plan might involve an orderly liquidation of assets, for which there may be no bidders other than IGT.

With respect to an alternative plan, the Debtor has explored various alternatives in connection with formulations and development of the Plan. The Debtor believes that the Plan enables Creditors to realize the greatest possible value under the circumstances and, compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

### b. Liquidation Analysis

When evaluating the terms of the Plan, each Creditor belonging to an Impaired Class should compare their treatment under the Plan with how they would be treated if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. Because the Pre-Petition Secured Parties hold a perfected security interest in all of the Debtor's assets, the Debtor's liquidation analysis shows that unsecured creditors would receive nothing in a chapter 7 liquidation. Accordingly unsecured creditors will receive more under the Plan than they would if the Debtor were liquidated.

  i. **Assumptions**. As described in ¶3b above, Debtor's June 2015 sale to a large public company terminated upon the filing of IGT's lawsuit. It is probable that no bidders

(other than IGT) would bid for Debtor's assets which are clouded by IGT's lawsuit.

ii. **Summary of Liquidation Analysis.** Due to IGT's lawsuit against Debtor, no bidder (other than IGT) could use Debtor's inventory or IP without first resolving IGT's lawsuit. As such, there is no liquidation value for Debtor's inventory and IP that would pay secured claims and generate a remainder for unsecured creditors.

## 7. GOING CONCERN VALUATION

As discussed in ¶3e above, Debtor's monthly expenses will exhaust Pre-Petition Secured Lender's cash collateral in three months (including Chapter 11 payments to professionals and adequate protection payments). A going concern valuation is not applicable to Debtor.

## 8. LIQUIDATED DEBTOR

The Debtor believes that, among other benefits, Confirmation of the Plan will provide partial payment to some unsecured creditors who otherwise would receive nothing. As the Prepetition Secured Parties hold a perfected security interest in all of the personal property assets owned by LFG, and this security interest exceeds the maximum proceeds from Debtor's asset sale to IGT, unsecured creditors would receive nothing absent this Plan.

### SUMMARY OF PLAN OF LIQUIDATION

a. **Introduction**

This Disclosure Statement contains a summary of the Plan, and is qualified in its entirety by the full text of the Plan itself. All terms defined in the Plan have the same meaning in this Disclosure Statement. The Plan, if confirmed, will bind the Debtor, any entity acquiring property under the Plan or otherwise transferring property pursuant to the Plan, and all Creditors in the Debtor's case. The Plan is intended to deal with all Claims against the Debtor and the Estate of whatever character, whether or not contingent or liquidated and whether or not allowed by the

Bankruptcy Court pursuant to § 502. All Creditors and other interested parties, are urged to carefully read the Plan.

The Plan designates three Classes of Claims: Secured Creditors, Priority Creditors and Unsecured Creditors. Administrative Expenses and Tax Claims, as set forth in the Plan, have not been classified and are excluded from the designation of Classes. A Claim shall be deemed classified in a particular class only to the extent that the Claim qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim qualifies within the description of such different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim or an Allowed Secured Claim in that Class.

b. **The Plan**

Debtor's liabilities will be categorized into three classes, all of which are impaired and may vote to accept the Plan:

**Class A**- Secured portion of Pre-Petition Secured Parties' Claim
**Class B**- Priority Claims
**Class C**- Unsecured Claims

c. **Treatment of Claims**

**Class A**-- Receives Distribution of the Class A Distribution

**Class B** -- Receives payment in full

**Class C** – Holders of Claims in Class C that do not opt out of the Release shall receive their Pro Rata share of the remainder of the Class A Lender Payment after distributions are made to all Allowed Priority Claims under class B.

9. **APPLICABLILITY OF FEDERAL AND OTHER SECURITIES LAWS**

Intentionally omitted.

///

///

### 10. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

#### a. Federal Income Tax Consequences to the Debtor

Debtor's NOL carry forward will not be available to IGT, which is buying Debtor's assets only (not the business).  Proceeds of the Debtor's asset sale to IGT include approximately $500,000 of otherwise taxable physical inventory which is excluded from sales tax by the Plan as permitted by § 1146.

#### b. Federal Income Tax Consequences to Creditors and Interest Holders

Creditors should rely on their own tax advisors to determine the asset sales resulting tax consequences, if any, to Creditors.

### 11. EFFECT OF CONFIRMATION

The provisions of the Debtor's Plan of Liquidation, if confirmed, shall bind the Debtor, all Creditors and any entity acquiring property under the Plan, whether or not the Claim of such Creditor is impaired under the Plan and whether or not such Creditor has accepted the Plan.


Leap Forward Gaming, Inc.

By /S/ Darby Bryant
Darby Bryant, CFO/Controller

DATED:  August 3, 2016.

**HARTMAN & HARTMAN**

/S/ Jeffrey L. Hartman
Jeffrey L. Hartman
Attorney for Debtor