# EXHIBIT A

**Final Execution Copy**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), is dated as of the 30th day June, 2016, by and between **IGT** (the "**Buyer**"), a Nevada corporation having its principal place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113 and **LEAP FORWARD GAMING, INC.** (the "**Seller**"), a Nevada corporation having its principal place of business at 10589 Double R Boulevard, Reno, Nevada 89521.  Terms not otherwise defined in the body of this Agreement shall have the meanings set forth in Schedule 1.

### Recitals

A.    Seller intends to file a voluntary petition for relief under Chapter 11 ("**Chapter 11 Case**") of Title 11 of the United States Code (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**").  Seller shall remain as debtor in possession.

B.    Upon the terms and subject to the conditions set forth herein and pursuant to Section 363 of the Bankruptcy Code, the Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, certain assets and rights of the Seller relating to the Seller's Products in the Gaming Market.,

B.    Mohammad Ali Saffari, an individual ("**Saffari**") owns 100% of the issued and outstanding capital stock of Seller.

C.    The Seller has advised that the Seller is insolvent.

D.    The Buyer, Seller, Saffari and certain other parties are parties to the Nevada Lawsuit.

E.    In order to induce the Buyer to purchase the Products pursuant to the terms hereof, Saffari is willing to enter into a non-competition agreement restricting Saffari's ability to compete with the Buyer subject to the terms and conditions set forth therein.

Therefore, the Buyer and the Seller, intending to be legally bound, hereby agree as follows:

## 1.    PURCHASE AND SALE

1.1.        Purchase and Sale.  Subject to the terms and conditions set forth in this Agreement and the Sale Order, the Seller agrees to sell, convey, assign, transfer and deliver to the Buyer, and the Buyer agrees to purchase from the Seller, at the Closing, all of the Seller's right, title and interest in and to all of the assets of the Seller used or held for use in, or related to, the Products as the same shall exist at the close of business on the Closing Date (as defined below) wherever

located ("**Purchased Assets**"), free and clear of all Liabilities and Liens. The Purchased Assets include without limitation the following assets:

(a)    All computers (and related hardware, software and data bases), equipment and other fixed assets, in each case, owned by Seller and used for, held for use for, or related to, the Products (the "**Purchased Fixed Assets**"), all of which are listed on Schedule 1.1(a).

(b)    All inventories, including parts, work in process, and finished goods owned by Seller and used or useful in connection with the Products.

(c)    All data and records, including books and records (other than minute books and records of directors' and shareholders' meetings), computer software, vendor lists, designs, manuals, warranties, customer lists, credit information, processes, formulae, proprietary rights, know-how and other similar intangible property and rights owned by Seller and relating to the Products.

(d)    All cost sheets, bills of material, pricing information, part information, technical information, customer data, engineering data, inspection data, production data, blueprints and specifications, drawings, licenses, license agreements, formulae, processes, trade secrets, software (including documentation and source code) of and related to the Products, in each case, owned by Seller.

(e)    All proprietary rights, know-how and other information related to the Products not described in subsection 1.1(e) above, in each case, that is owned, licensed or otherwise used by Seller.

(f)    The trademarks and trademark applications, tradenames, licenses, copyrights and applications and all similar rights owned by Seller and related to the Products listed on Schedule 1.1 (f).

(g)    All goodwill as a going concern with respect to the Purchased Assets.

(h)    The patents listed on Schedule 1.1(h).

(i)    Such other assets that are licensed or otherwise used by Seller necessary to deliver the Products to existing and potential customers of Buyer ("**Third Party Assets and Licenses**"). The Third Party Assets and Licenses are listed on Schedule 1.1(i).

(j)    The books and records of Seller relating to subsection 1.1 (a) through (i) above.

1.2.    Excluded Assets.  The Purchased Assets shall not include any assets of the Seller not described in Section 1.1 above.

2

**2.    PURCHASE PRICE; EARN OUT**

2.1.    Purchase Price.  The purchase price (the "**Purchase Price**") for the Purchased Assets shall be $2,500,000, plus the amount, if any, due in respect to the Earn Out, as described in Section 2.3 below.  The Purchase Price shall be paid as provided in Section 4.2(a).

2.2.    Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets as set forth on Schedule 2.2.  The Buyer and the Seller each further agree to file their income tax returns and their other tax returns and IRS Form 8594 reflecting the allocation set forth on such Schedule and not to take a position in any judicial proceeding that is inconsistent with the terms thereof unless otherwise required by applicable legal requirements.

2.3.    Earn Out.  Seller shall be entitled to receive 20% of all amounts invoiced by the Buyer in excess of $2,500,000, under both the LVS Agreement and the TVC Agreement (together, the "**Applicable Customer Contracts**") during the 24 month period following the effective date of each such Applicable Customer Contract (the "**Earn Out**").  Payments of the Earn Out, if any, shall be paid only following actual receipt by the Buyer of revenues under the Applicable Customer Contracts.  The Earn Out shall be capped at $6,000,000 in the aggregate.  Examples of potential payments under the Earn Out are set forth on Schedule 2.3.

**3.    LIMITED ASSUMPTION OF LIABILITIES**

3.1.    Limited Assumption of Liabilities.  At and as of the Closing, Buyer shall assume and agree to pay, perform and discharge all Liabilities accruing or due to be performed from and after the Closing Date pursuant to or in respect of all Purchased Assets only as set forth on Schedule 3.1 (the "**Assumed Liabilities**").  Other than the Assumed Liabilities, the Buyer shall not be obligated to assume or become liable for any of the Seller's Liabilities or Liens, known or unknown, fixed or contingent.

**4.    CLOSING; CLOSING PAYMENTS AND OBLIGATIONS**

4.1.    Closing.  The closing (the "**Closing**") of the purchase and sale of the Purchased Assets provided for in this Agreement shall take place 15 days after entry of the Sale Order for which no stay order pending appeal has been ordered (the "**Closing Date**"), or at such other time and place or in such other manner as the Buyer and the Seller may agree in writing.  Subject to the provisions of Article 10, failure to consummate the purchase and sale provided for in this Agreement on the date and time and in the manner determined pursuant to this Section 4.1 will not result in the termination of this Agreement and will not relieve any party of its obligations under this Agreement.  The Closing shall take place at the offices of IGT at 6355 S. Buffalo Drive, Las Vegas, NV 89113.

4.2.    Closing Payments and Obligations.  At the Closing:

(a)    The Buyer shall deliver to Seller:

(i) an amount equal to $2,500,000 in immediately available funds;

(ii) a bringdown certificate executed by the Buyer, in the form of Exhibit A-1 ("**Buyer's Bringdown Certificate**");

(iii)     a certificate of the Secretary of Buyer, in the form of Exhibit A-2 ("**Certificate of Secretary to Buyer**");

(iv)     a consulting agreement with Saffari executed by the Buyer in the form of Exhibit B (the "**Consulting Agreement**");

(v)     a mutual release executed by each of the parties to the Nevada Lawsuit in the form of Exhibit C (the "**Nevada Lawsuit Release**");

(vi)     an assignment executed by each of the parties , selling, assigning, transferring, and setting over unto Buyer any and all right, title, and interest Seller has in and to the Patents set forth in Schedule 1.1(h) in the form of Exhibit H-1 (the "**Patent Assignment**"); and

(vii)     an assignment executed by each of the parties , selling, assigning, transferring, and setting over unto Buyer any and all right, title, and interest Seller has in and to the Trademarks set forth in Schedule 1.1(f) in the form of Exhibit I (the "**Trademark Assignment**")

The documents listed in subsections (i) through (vii) above are herein collectively referred to as "**Buyer's Closing Documents**".

(b)     The Seller will deliver to the Buyer:

(i)     a Bill of Sale in the form of Exhibit E;

(ii)     the Consulting Agreement executed by Saffari;

(iii)     a Noncompetition Agreement executed by Saffari in the form of Exhibit F;

(iv)     a bringdown certificate executed by the Seller in the form of Exhibit G-1 ("**Seller's Bringdown Certificate**");

(v)     a certificate of the Secretary of Buyer in the form of Exhibit G-2 ("**Certificate of Secretary to Seller**");

(vi)     a certified copy of the Sale Order;

(vii)     a mutual release executed by each of the parties to the Nevada Lawsuit in the form of Exhibit C (the "**Release**");

4

(viii)    a Patent Assignment executed by the parties;

(ix)    a Trademark Assignment executed by the parties; and

(x)    certified copies of recordation cover sheets for all patents listed on Schedule 1(h) ("**Patent Recordation Cover Sheets**") in the form of Exhibit H-2.

The documents listed in subparagraphs (i) through (x) above are herein collectively referred to as "**Seller's Closing Documents**".

5.    **REPRESENTATIONS AND WARRANTIES OF SELLER**

In order to induce the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, except as set forth in the schedules attached hereto the Seller and Saffari each represents and warrants to the Buyer that:

5.1.    Corporate Existence and Power.  The Seller is a corporation duly incorporated, validly existing and in good standing under the laws of Nevada and has all corporate powers and governmental authority required to carry on its business as now conducted, to own or use the properties and assets that it purports to own or use, and to perform all of its obligations under this Agreement.

5.2.    Authorization.  Subject only to Bankruptcy Court approval pursuant to the Sale Order, the execution and performance by the Seller of the terms and provisions of this Agreement has been duly authorized by all requisite corporate, shareholder and other action. This Agreement has been, and the Seller's Closing Documents to be entered into by the Seller or the other parties thereto will be, duly executed and delivered on behalf of the Seller or the other parties thereto, as the case may be.  This Agreement constitutes the legal, valid and binding obligation of the Seller enforceable against the Seller in accordance with its terms.  Upon the execution and delivery of the Seller's Closing Documents, the Seller's Closing Documents will constitute the legal, valid and binding obligations of the Seller or Saffari, enforceable against the Seller or the other parties thereto, as the case may be, in accordance with their respective terms.

5.3.    Governmental Authorization.  Subject only to Bankruptcy Court approval pursuant to the Sale Order, the execution, delivery and performance of this Agreement and the Seller's Closing Documents and the consummation of the transactions contemplated hereby require no consent or other action by or in respect of, or filing with, any governmental authority by or on behalf of the Seller or Saffari.

5.4.    Noncontravention.  The execution, delivery and performance of this Agreement and the Seller's Closing Documents and the consummation of the transactions contemplated hereby and thereby do not and will not: (i) contravene, conflict with or violate the articles of

5

organization or by-laws of the Seller or any resolution adopted by the board of directors or the stockholders of the Seller, (ii) contravene, conflict with or violate any applicable law, rule, regulation, judgment, injunction, order or decree to which the Seller or Saffari, or any of the Purchased Assets, may be subject, (iii) subject only to Bankruptcy Court approval pursuant to the Sale Order, require any consent or other action by any Person or constitute a default under, contravene or conflict with, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Seller or loss of any benefit to which the Seller is entitled under any provision of, any agreement, commitment, plan or instrument binding upon the Seller (including any Purchased Contract) or upon Saffari or (iv) result in the creation or imposition of any Lien on any Purchased Asset.

5.5.    Title to Purchased Assets; Condition of Purchased Assets.  The Seller has, and will convey to the Buyer at Closing, good and merchantable title to the Purchased Assets.  No Person other than the Seller owns any tangible property situated on the Premises or necessary to deliver or maintain the Products.   All of the Purchased Assets are free and clear of all Liens (except for Assumed Liabilities), all of which shall be released and discharged on or prior to the Closing Date.

5.6.    Purchased Assets.  The Purchased Assets, including the Third Party Assets and Licenses, are all of the assets necessary to deliver and maintain the Products.

5.7.    Inventory. All inventory included among the Purchased Assets is in good condition and fit for the particular purpose for which it was acquired by the Seller.

5.8.    Licenses. The licenses listed on Schedule 5.8 hereto (the "**Licenses**") constitute all licenses, permits, and governmental authorizations and approvals necessary for the operation of the Seller.  The Seller has duly obtained and legally and validly holds all the Licenses, all of which are valid and in full force and effect.  No proceeding (judicial, administrative, or otherwise) has been commenced or to the Seller's Knowledge threatened which could lead to a revocation, suspension, or limitation of the rights under any License, and the Seller is in compliance with each of the Licenses and knows of no facts which could lead to any such revocation, suspension, or limitation. The Seller has delivered to the Buyer true and complete copies of each of the Licenses.

5.9.    Tax Matters. The Seller has timely filed with the appropriate governmental agency all federal, state, local and foreign tax returns, reports and statements which are required to be filed by or on behalf of the Seller; and all such tax returns are complete and accurate and properly reflect all taxes required to be paid for the periods covered thereby.  The Seller has paid all taxes due prior to the date hereof and will pay when due (or contest in good faith by appropriate filing) all taxes which may become due before, on or after the Closing Date with respect to the Seller's ownership and operation of the Purchased Assets through the Closing Date.

5.10.    Litigation.   Except as set forth on Schedule 5.10, there is no action, suit, investigation, arbitration or proceeding before any court, arbitrator or governmental authority pending against, or to the Knowledge of the Seller, threatened against or affecting the Seller or any Purchased Asset, or Saffari with respect to the Seller, or which in any manner has a material

6

adverse effect on Buyer's ability to sell the Products to its customers or could otherwise materially impair Buyer's ownership of the Purchased Assets, nor does the Seller have Knowledge of any reasonable basis for any such action, suit, investigation, arbitration or proceeding. The Seller is not a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental authority which may adversely affect the Seller, its assets or the transactions contemplated hereby.

5.11.    <u>Compliance with Laws</u>.  The Seller has not violated, is currently not in violation of, and to the Seller's Knowledge, no notice or charge of violation has been issued, made or threatened with respect to, any statute, law, ordinance, decree, order, rule or regulation of any governmental body applicable to the Seller or the Purchased Assets.

5.12.    <u>Labor Matters</u>.  The Seller has complied and is in compliance with, in all material respects, applicable legal requirements pertaining to the employment of labor, including those relating to wages, hours, collective bargaining, employment discrimination, drug testing, polygraphs, sexual harassment, worker's compensation, immigration, plant closing, unemployment compensation and the payment of or withholding of taxes, and there are no claims, causes of action, charges, suits, complaints, administrative proceedings, arbitrations, material labor grievances, or government investigations or proceedings, pending or, to the Knowledge of the Seller, threatened against the Seller in connection therewith. The Seller has not received notice of, nor does the Seller have Knowledge of any matter that could reasonably form the basis for, any such claims.  There are no collective bargaining agreements covering any employees of the Seller, no collective bargaining agent has been certified as a representative of any of the employees of the Seller, and no representation campaign or election is now in progress with respect to any of the employees of the Seller.

5.13.    <u>Liability Insurance</u>.  The assets, properties and operations of the Seller are insured under one or more policies of general liability. All such policies are in full force and effect in accordance with their terms, no notice of cancellation has been received by the Seller or any other responsible party, and there is no existing default or event which, with the giving of notice or lapse of time or both, would constitute a default thereunder.  Such policies are in amounts which are adequate in relation to the business and assets of the Seller and all premiums to date have been paid in full.

5.14.    <u>Worker Compensation</u>.  All of the Seller's employees are covered under one or more worker compensation policies in full force and effect.

5.15.    <u>Malicious Code</u>.  None of the Products contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," adware, spyware, Internet bots, malware, bugs, web bugs, or other surreptitious code (as such terms are commonly understood in the software industry) or any other code designed or intended to have any of the following functions: (i) disrupting, disabling, harming or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed; or (ii) damaging or destroying any data or file without the user's

consent (all of the foregoing collectively referred to as "**Malicious Code**"). The Seller has taken commercially reasonable precautions to protect the Products from Malicious Code. There have been no breaches of security that resulted in a disclosure of any material trade secrets. The Seller is in compliance with all applicable laws regarding the security of the Products.

5.16. Open Source. None of the Products has any Publicly Available Software and the Seller has not used Publicly Available Software in whole or in part in the development of any part of the Products in a manner that may subject the Seller or the Products in whole or in part, to all or part of the license obligations of any Publicly Available Software.

5.17. Finders' Fees. There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Seller or Saffari who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

5.18. Arms-Length Transactions, Conflicts of Interest. To the Knowledge of the Seller: (a) all transactions with third parties are and have been conducted on an arm's-length basis; and (b) neither the elected officers of the Seller nor the key employees, or their respective spouses, have (or had during the past three fiscal years) any material direct or indirect ownership or profit participation in outside business enterprises with which the Seller had material purchases, sales or business dealings.

5.19. Disclosure. No representation or warranty by the Seller in this Agreement, nor any information delivered to the Buyer in connection with the transactions contemplated by this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained therein not misleading. Except as disclosed in Schedules or as otherwise disclosed to Buyer in writing, there is no fact or other information relating to the Seller that is known to the Seller and that could reasonably be expected to be material to the ownership or use of Purchased Assets.

5.20. Adequacy of Price. The Purchase Price and Earn Out represent fair value for the Purchased Assets.

5.21. Notice. Seller has provided the required notice to any known claimants of any Liens against the Purchased Assets.

## 6. REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer represents and warrants to the Seller as follows:

6.1. Corporate Existence and Power. The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all limited corporate powers and governmental authority required to carry on its business as now conducted, to own

8

or use the properties and assets that it purports to own or use, and to perform all of its obligations under this Agreement.

6.2.    Authorization.  The execution and performance by the Buyer of the terms and provisions of this Agreement have been duly authorized by all requisite corporate action.  This Agreement has been, and the Buyer's Closing Documents will be, duly executed and delivered on behalf of the Buyer.  This Agreement constitutes the legal, valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms.  Upon the execution and delivery of the Buyer's Closing Documents, the Buyer's Closing Documents will constitute the legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

6.3.    Governmental Authorization.  The execution, delivery and performance of this Agreement and the Buyer's Closing Documents and the consummation of the transactions contemplated hereby and thereby require no consent or other action by or in respect of, or filing with, any governmental authority by or on behalf of the Buyer.

6.4.    Noncontravention.  The execution, delivery and performance of this Agreement and the Buyer's Closing Documents and the consummation of the transactions contemplated hereby and thereby do not and will not:  (i) contravene, conflict with or violate the certificate of formation or operating agreement of the Buyer or any resolution adopted by the officers or members of Buyer, (ii) contravene, conflict with or violate any applicable law, rule, regulation, judgment, injunction, order or decree to which the Buyer may be subject, or (iii) require any consent or other action by any Person or constitute a default under, contravene or conflict with, or give rise to any right of termination, cancellation or acceleration of any right or obligation of the Buyer or loss of any benefit to which the Buyer is entitled under any provision of, any agreement, commitment, plan or instrument binding upon the Buyer.

6.5.    Finders' Fees.  There is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Buyer who might be entitled to any fee or commission in connection with the transactions contemplated by this Agreement.

7.    **COVENANTS OF THE SELLER**

The Seller agrees that from the date hereof until the Closing Date:

7.1.    Conduct of the Seller.  The Seller will not interfere with the Buyer's business and its efforts to sell the Products after the Closing Date and will use commercially reasonable efforts to preserve intact the Seller's relationships and goodwill with customers and other third parties.  The Seller will confer with the Buyer concerning the transition of any matters involving the ownership or use of the Purchased Assets and delivery or maintenance of the Products.

7.2.    Access to Information.  The Seller will: (i) give the Buyer and its Representatives full access to the offices, properties, personnel, contracts, books and records (written and

electronic) of the Seller relating to the Products, (ii) furnish the Buyer and its Representatives with copies of all such contracts, books and records, and other existing documents and data as the Buyer may reasonably request, (iii) furnish to the Buyer and its Representatives such other operating data and other information relating to the Products as such Persons may reasonably request and (iv) instruct the employees and Representatives of the Seller to cooperate with the Buyer in its due diligence review of the Products.  Any investigation pursuant to this Section shall be conducted in such manner as not to interfere unreasonably with the conduct of the Seller's business and shall occur following notice by the Buyer to the Seller and at a mutually agreeable time.

7.3.    <u>Notices of Certain Events</u>.  The Seller will promptly notify the Buyer in writing if it becomes aware of:

(a)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any notice or other communication from any governmental authority in connection with the transactions contemplated by this Agreement;

(c)    any actions, suits, claims, investigations or proceedings commenced or, to the Seller's Knowledge, threatened against, relating to, involving or otherwise affecting the Seller or any of the transactions contemplated hereby;

(d)    any breach or threatened breach of, or the existence of any fact, condition or event that could reasonably be expected to result in a breach of, any representation or warranty made by the Seller hereunder.

7.4.    <u>Required Approvals and Permits</u>.  The Seller will, as promptly as practicable after the date of this Agreement, use commercially reasonable efforts to obtain any consents or approvals of any Person, will give all notices and make all filings with any Person, will apply for the transfer to the Buyer by applicable governmental authorities of any Permits to be transferred to the Buyer hereunder and will assist the Buyer in obtaining the issuance by applicable governmental authorities of all Permits to be issued directly to the Buyer, to the extent that any of the same actions are necessary for the authorization, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

7.5.    <u>Creditors</u>.

(a)    The Seller has previously supplied to the Buyer a true and complete list of its creditors (identifying those with a Lien on the Purchased Assets).  Within seven (7) days prior to the Closing Date, Seller shall update and provide to the Buyer a true and complete list of its creditors (identifying those with a Lien on the Purchased Assets), all of which shall have been given notice by the Seller.  This creditor lists shall include each bank, institutional lender, individual or other

creditor which has or purports to have loans or other forms of credit outstanding to the Seller with respect to the Purchased Assets.

(b)     The Seller shall take any actions required by the Sale Order to ensure that the Purchased Assets shall be free and clear of all Liabilities and Liens on the Closing Date.

7.6.    <u>Commercially reasonable efforts</u>.  The Seller will use commercially reasonable efforts to cause the conditions in Sections 10.1 to be satisfied.


## 8.     COVENANTS OF THE BUYER

8.1.    <u>Required Approvals</u>.  The Buyer will, as promptly as practicable after the date of this Agreement, use commercially reasonable efforts to obtain any consents or approvals of any Person, will give all notices and make all filings with any Person, to the extent that any of the same actions are necessary for the authorization, execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

8.2.    <u>Commercially Reasonable Efforts</u>.  The Buyer will use commercially reasonable efforts to cause the conditions in Sections 10.2 to be satisfied.


## 9.     EMPLOYMENT

9.1.    <u>Employment</u>.  (a) The Buyer and the Seller agree that the Buyer has not offered any terms of employment to any of the Seller's employees as consideration for the sale contemplated herein.  It is agreed that in the event that the Buyer elects, in its discretion, to employ any employees of the Seller, then such employees shall each be an "employee-at-will" of the Buyer, and the Buyer shall have no contractual obligation with regard to such employment.

(b)     The Seller acknowledges and agrees that the Buyer will not assume any liability or obligation of the Seller to the Seller's employees (including, without limitation, any obligation with respect to sick pay, vacation pay or other benefits) for any period prior to the Closing Date and, other than as provided in the Employment Agreement, the Buyer has no commitment or obligation whatsoever to employ any employees of the Seller.  Prior to the Closing Date, the Seller will provide its employees with any notification regarding this transaction or the effect thereof required under any applicable federal or state law.  The Buyer shall have the right to interview the Seller's employees listed on Schedule 9.1 prior to the Closing Date for the purposes of determining which employees will be offered employment.  Such interviews shall be conducted at such times and places as shall be mutually agreeable to the Buyer and the Seller.  The Seller agrees to use commercially reasonable efforts in cooperation with the Buyer in securing the services of those employees of the Seller that the Buyer desires to employ.

10.    **CONDITIONS TO CLOSING**

10.1.    Conditions to Obligations of the Buyer.  The obligation of the Buyer to purchase the Purchased Assets and to take the other actions required to be taken by the Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by the Buyer, in whole or in part):

(a)    Entry of the Sale Order for which no stay order pending appeal has been ordered.

(b)    Expiration of all applicable periods for appeal and stays of the Sale Order.

(c)    Seller shall not have committed a default.

(d)    Each of the representations and warranties of the Seller in this Agreement, shall have been accurate as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date.

(e)    Each of the covenants and obligations that the Seller is required to perform or to comply with pursuant to this Agreement on or prior to the Closing, shall have been duly performed and complied with in all material respects.

(f)    The Buyer shall have received the Seller's Bringdown Certificate.

(g)    On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened before any court or governmental authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

(h)    There shall not have occurred any event which would reasonably be expected to have a materially adverse effect on the business, operations, assets, properties or the Products; provided, however, filing the Chapter 11 Case under the Bankruptcy Code in the Bankruptcy Court shall not shall not be deemed to have a materially adverse effect hereunder.

(i)    All actions, proceedings, resolutions, instruments and documents required to carry out this Agreement and all other related legal matters incident thereto shall have been approved on the Closing Date by the Buyer's counsel, in the exercise of their reasonable judgment. The Seller shall also have delivered to the Buyer such other documents, instruments, certifications and further assurances as such counsel may reasonably require, including documents (i) evidencing the corporate and tax good standing of the Seller; (ii) evidencing the authority of the Seller to enter into and consummate the transactions contemplated by this Agreement.

(j)    The Seller and Saffari shall have executed and delivered to the Buyer each of the documents to be delivered by them pursuant to Section 4.2(b).

(k)    The Buyer shall have entered into the LVS Agreement and the TVC Agreement.

(l)      The Buyer shall have entered into an agreement with Scientific Games Corporation (or an affiliate thereof) permitting Buyer to access the casino gaming systems necessary to enable Buyer to deliver the Products on any LVS gaming system.

10.2.    <u>Conditions to Obligations of the Seller</u>.  The obligation of the Seller to sell the Purchased Assets and to take the other actions required to be taken by the Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by the Seller, in whole or in part):

(a)      Each of the representations and warranties of the Buyer in this Agreement, shall have been accurate as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date.

(b)      Each of the covenants and obligations that the Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing, shall have been duly performed and complied with in all material respects.

(c)      The Seller shall have received the Buyer's Bringdown Certificate.

(d)      The Seller shall have received the payments pursuant to Section 4.2(a).

(e)      On the Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental authority in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby.

(f)      All actions, proceedings, resolutions, instruments and documents required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the Closing Date by counsel for the Seller in the exercise of their reasonable judgment.  The Buyer shall also have delivered to the Seller such other documents, instruments, certifications and further assurances as such counsel for the Seller may reasonably require.

(g)      On the Closing Date, Seller shall receive evidence of the filing of a motion and stipulated order for dismissal of the Nevada Lawsuit with prejudice.

## 11.    SURVIVAL; INDEMNIFICATION; LIMITATION ON LABILITY

11.1.    <u>Survival</u>. The covenants, agreements, representations and warranties of the parties hereto contained in this Agreement, in the Schedules and in any other certificate or other writing delivered pursuant to this Agreement shall survive the Closing until the expiration of the periods described below, and shall survive thereafter, to the extent a claim for indemnity on account thereof is made prior to such expiration:

a.       with respect to matters of title to the Purchased Assets, for an indefinite period;

13

b.    with respect to indemnities contemplated by Sections 11.2(i) and 11.2(iv), and by Section 11.3(i), for an indefinite period;

c.    for all other representations and warranties in this Agreement or in any schedule, certificate or other agreement executed and delivered pursuant to this Agreement, and with respect to the indemnities contemplated by Sections 11.2(ii) and 11.2(iii) and Sections 11.3(ii) and 11.3(iii) hereof, for a period ending eighteen (18) months following the Closing Date.

11.2.    <u>Indemnification by the Seller</u>.  The Seller agrees to defend, indemnify and hold harmless the Buyer, its parent and subsidiary corporations, their respective directors, officers, employees, stockholders, agents, and affiliates (collectively, **"Buyer's Indemnified Persons"**) from and against and will pay to the Buyer's Indemnified Persons the amount of, all losses, damages, liabilities, payments and obligations, and all costs and expenses related thereto, including reasonable legal fees (collectively "**Damages**") arising, directly or indirectly, from or in connection with:

(i) The Seller's failure to promptly pay, discharge, or perform when due any of its liabilities or obligations which are not expressly assumed by the Buyer pursuant to this Agreement;

(ii)    any misrepresentation or breach of warranty by the Seller in or pursuant to this Agreement, the schedules or any other certificate or agreement executed and delivered by the Seller pursuant hereto or in connection with the Closing;

(iii)    any breach by the Seller or Saffari of any covenant or agreement in or made pursuant to this Agreement or any of the Seller's Closing Documents; and

(iv)    failure by the Seller to pay in full all of the Seller's creditors as contemplated by Section 7.6.

11.3.    <u>Indemnification by the Buyer</u>.  The Buyer agrees to defend, indemnify and hold harmless the Seller and Saffari (collectively, "**Seller's Indemnified Persons**") from and against and will pay to the Seller's Indemnified Persons the amount of all Damages arising, directly or indirectly, from or in connection with:

(i)    The Buyer's failure to promptly pay, discharge, or perform when due the Assumed Liabilities after the Closing;

i.    any misrepresentation or breach of warranty by the Buyer in or pursuant to this Agreement or any other certificate or agreement executed and delivered by the Buyer pursuant hereto or in connection with the Closing; or

14

ii.    any breach by the Buyer of any covenant or agreement in or made pursuant to this Agreement or any of the Buyer's Closing Documents.

11.4.    <u>Payment of Indemnification</u>. Claims for indemnification under this Article 11 shall be paid or otherwise satisfied by the Indemnifying Person within thirty (30) days after notice of its indemnification obligation is provided pursuant to this Article 11.

11.5.    <u>Other Rights and Remedies Not Affected</u>. The indemnification rights of the parties under this Article 11 are independent of and in addition to such rights and remedies as the parties may have at law or in equity or otherwise for any misrepresentation, breach of warranty or failure to fulfill any agreement or covenant hereunder on the part of any party hereto, none of which rights or remedies shall be affected or diminished hereby.

11.6.    <u>Limitation on Liability</u>. Buyer and Seller agree that the other party shall not be liable for any Damages for an aggregate amount in excess of the Earn Out amount set forth in Section 2.3 of this Agreement. Neither party shall be liable for incidental, special, consequential or punitive damages. The foregoing limitation of liability shall be construed as limiting payment of fees accrued and due for payment but not yet paid.

## 12.    TERMINATION

12.1    <u>Grounds for Termination</u>. This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)  by mutual written agreement of the Seller and the Buyer;

(b)  by either the Seller or the Buyer if the Closing shall not have been consummated within one hundred and ten (110) days of the date hereof or such later date as to which the parties may agree; *provided*, such right to terminate under this subparagraph shall not be available to any party whose breach has been a cause of such failure to close; subject of the right of the Buyer to extend such deadline if Seller is diligently prosecuting a request for approval of this Agreement by the Bankruptcy Court; and further subject of the right of the Seller to extend such deadline by an additional thirty (30) days if Buyer is diligently negotiating the terms of the LVS Agreement and the TVC Agreement;

(c)  by either the Buyer or the Seller, after expiration of thirty (30) days written notice of a material misrepresentation having been made or material breach of any provision of this Agreement having been committed by the other party and such misrepresentation or breach has not been cured or waived within such thirty (30) day period;

(d)  (i)    subject to Section 12.1(e), by the Buyer, if satisfaction of any of the conditions in Section 10.1 is or becomes impossible (other than through the failure of the Buyer to comply

15

with its obligations under this Agreement) and the Buyer has not waived such condition on or before the Closing Date; or

       (ii)    by the Seller, if satisfaction of any of the conditions in Section 10.2 is or becomes impossible (other than through the failure of the Seller to comply with their obligations under this Agreement) and the Seller has not waived such condition on or before the Closing Date.

     (e)    by the Buyer, if Seller fails to file the Chapter 11 Case under the Bankruptcy Code in the Bankruptcy Court within ten (10) days of the date this Agreement is executed.

     (f)    by the Buyer, if Sale Order is not entered within ninety (90) days of the date this Agreement is executed.

    The party desiring to terminate this Agreement pursuant to clauses 12.1(b), 12.1(c) or 12.1(d) shall give prompt written notice of such termination to the other party.

    12.2    <u>Effect of Termination</u>. Each party's right of termination under Section 12.1 is in addition to any other rights such party may have under this Agreement or otherwise, and the exercise of a right of termination will not be deemed to be an election of remedies. If this Agreement is terminated pursuant to Section 12.1, all further obligations of the parties under this Agreement will terminate, except the obligations of Sections 13.1 (Confidentiality), 13.6 (Amendments and Waivers), 13.7 (Successors and Assigns) and 13.8 (Governing Law) shall survive any termination of this Agreement; *provided*, however, that if this Agreement is terminated by a party because of the breach of this Agreement by the other party or because one or more conditions to the terminating party's obligations under the Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination.

## 13.    MISCELLANEOUS

    13.1.    <u>Confidentiality</u>. Except to the extent required to obtain Bankruptcy Court approval and for appropriate filings in the United States District Court in which the Nevada Lawsuit is filed, prior to the Closing Date and after any termination of this Agreement, each party hereto will hold, and at all times after the Closing Date the Seller will hold, and in such circumstances each such party will use commercially reasonable efforts to cause their respective Representatives to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of law, all confidential documents and information concerning the Seller, the Purchased Assets or other party furnished in connection with the transactions contemplated by this Agreement.

    13.2.    <u>Additional Instruments of Transfer</u>. From time to time after the Closing, each party shall, if requested by another party, make, execute, acknowledge and deliver such additional assignments, bills of sale, deeds and other instruments, as may be reasonably necessary or proper to carry out the specific provisions of this Agreement, including transfer to

the Buyer of all of the Seller's right, title and interest in and to the Purchased Assets. Such efforts and assistance shall be at the cost of the requesting party.

13.3.    Wind-Down; Non-Competition.

13.3.1. The Seller and Saffari each covenant and agrees that the Seller and Saffari and any affiliates controlled by each of them will not, directly or indirectly during the period commencing on the Closing Date and expiring on the **second** anniversary of the Closing Date (the "**Restrictive Period**"): (a) form, acquire, invest in, finance, own, operate, manage, assist, support, provide premises, facilities, goods or services to, or become associated in any capacity or to any extent, directly or indirectly with, whether as a shareholder, partner, member, joint venture, advisor, consultant or independent contractor, an enterprise (a "**Competing Business**") which is engaged in the sale of goods or services in any way similar to or related to the Products; (b) interfere with or attempt to interfere with any employees, representatives or agents of the Buyer, or any Affiliate of the Buyer, or induce or attempt to induce any of them to leave the employ of the Buyer or any Affiliate, or violate the terms of his or her contract with the Buyer or any Affiliate of the Buyer; or (c) call upon, solicit, advise or otherwise do, or attempt to do, business with any clients, suppliers, customers or accounts of the Buyer or any Affiliate of the Buyer or take away or interfere or attempt to take away or interfere with any custom, trade, business or patronage of the Buyer or any Affiliate of the Buyer related to the Products. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 13.3 is invalid or unenforceable, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to achieving the intention of the parties as set forth herein, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

13.4.    Intentionally Left Blank.

13.5.    Books, Records and Employees.  The Seller and the Buyer agree that they will cooperate with and make available to the other party, during normal business hours, all books, records, information and employees (without substantial disruption of employment) necessary and useful in connection with any tax inquiry, audit, investigation or dispute, any litigation or investigation or any other matter requiring any such books, records, information or employees for any reasonable business purpose. The party requesting any such books, records, information or employees shall bear all of the out-of-pocket costs and expenses (including without limitation, reasonable attorneys' fees, but excluding reimbursement for the salaries and employee benefits) reasonably incurred in connection with providing such books, records, information or employees.

13.6.    Amendments and Waivers.  Any provision of this Agreement may be amended or waived if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each party to this Agreement, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power

or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

13.7.    Expenses.  Except as otherwise expressly provided in this Agreement or the Order, whether or not the transactions contemplated hereby are consummated, the Seller and the Buyer shall bear their own costs and expenses arising out of the negotiation, execution, delivery and performance of this Agreement (including regulatory filing fees and costs) and the consummation of the transaction contemplated by this Agreement, including, without limitation, fees and expenses for legal counsel, accountants, business valuators, brokers and financial advisors.

13.8.    Successors and Assigns.   The Buyer may, in its sole discretion, assign this Agreement to an Affiliate or other designated assignee whom, upon assignment, shall become the defined Buyer in this Agreement. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; *provided* that no party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of each other party hereto, except that the Buyer may transfer or assign, in whole or from time to time in part, to one or more of its affiliates, all or a portion of its rights, duties, and obligations hereunder.

13.9.      Governing Law.   This Agreement shall be governed by and construed in accordance with the State of Nevada without regard to the conflicts of law rules of such state. Disputes regarding this Agreement following the filing of the Chapter 11 Case shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

13.10. WAIVER OF JURY TRIAL.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.11. Counterparts; Third Party Beneficiaries.  This Agreement may be signed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same Agreement. No provision of this Agreement is intended to confer upon any Person other than the parties hereto any rights or remedies hereunder.

13.12. Entire Agreement.  This Agreement (including all schedules, exhibits and other documents contemplated by this Agreement, all of which are hereby incorporated by reference) constitutes the entire agreement between the parties with respect to the subject matter of this Agreement and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

13.13.    Severability.  If any provision (or any portion thereof) of this Agreement shall be held invalid or unenforceable, the remaining portion of such provision and the remaining provisions of this Agreement shall not be affected thereby.

13.14.    Attorneys' Fees. In the event of the bringing of any action, arbitration or suit by a party hereto against another party hereunder by reason of any breach of any of the covenants, agreements or provisions on the part of the other party arising out of this Agreement, then in that event the prevailing party will be entitled to have the recovery of and from the other party all costs and expenses of the action, arbitration or suit, reasonable attorneys' fees and any other professional fees resulting therefrom.

13.15.    Notices. Any notice required or permitted to be given under this Agreement shall be in writing and delivered or sent by: (i) personal delivery; or (ii) Federal Express or similar nationally recognized overnight courier service, and addressed to the parties at their respective addresses as they appear below. The parties may change their addresses for notice by giving notice of such change in accordance with this Section. Notices shall be deemed to have been received upon the date of delivery (or refusal to accept delivery) as indicated on the return receipt or air bill.

| If to Seller: | If to Buyer: |
|---|---|
| Robison, Belaustegui, Sharp & Low<br>71 Washington St.<br>Reno, NV 89503<br>Attn: Kent Robison | IGT<br>6355 S. Buffalo Drive<br>Las Vegas, NV 89113<br>Attn: General Counsel |

**[Signatures appear on following page]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

IGT

By: _____

Name: Victor Duarte

Title: SVP + Global Chief Product Officer

LEAP FORWARD GAMING, INC.

By: _____

Name:

Title:

MOHAMMAD ALI SAFFARI, an Individual

By: _____

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**IGT**

By: _____
　　　Name:
　　　Title:

**LEAP FORWARD GAMING, INC.**

By: _____
　　　Name:  Ali Saffari
　　　Title:  President and CEO

**MOHAMMAD ALI SAFFARI, an Individual**

By: _____
　　　Name:  Ali Saffari
　　　Title:  self

20

**EXHIBITS**

| | |
|---|---|
| A-1 | Form of Buyer's Bringdown Certificate |
| A-2 | Form of Certificate of Secretary to Buyer |
| B | Form of Consulting Agreement |
| C | Nevada Lawsuit Release |
| D | Omitted |
| E | Form of Bill of Sale |
| F | Form of Noncompetition Agreement |
| G-1 | Form of Seller's Bringdown Certificate |
| G-2 | Form of Certificate of Secretary to Seller |
| H-1 | Patent Assignment |
| H-2 | Certified copies of Patent Recordation Cover Sheets |
| I | Trademark Assignment |

**SCHEDULES**

| | |
|---|---|
| 1 | Defined Terms |
| 1.1(a) | Purchased Fixed Assets |
| 1.1 (f) | Trademarks |
| 1.1(h) | Patents |
| 1.1(i) | Third Party Assets and Licenses |
| 2.2 | Allocation of Purchase Price |
| 2.3 | Earn Out Examples |
| 3.1 | Assumed Liabilities |
| 5.8 | Licenses |
| 5.10 | Litigation |
| 9.1 | Employment Offers |

**EXHIBIT A-1**
**FORM OF BUYER'S BRINGDOWN CERTIFICATE**

**BUYERS'S BRINGDOWN CERTIFICATE**
**("Certificate")**

IGT, a Nevada corporation (the "Buyer") in connection with that certain Asset Purchase Agreement dated as of June 30, 2016 entered into between Buyer and Leap Forward Gaming, Inc., a Nevada corporation ("Seller"), in accordance with the terms of the Agreement, does hereby certify to the Seller the following as to the Closing Date, as hereinafter defined:

1.    Except as may be disclosed on **Schedule 1** attached hereto and subject to any qualifications that may be set forth in the Agreement, the warranties and representations of Seller set forth in <u>Section 6</u> of the Agreement are, as of the Closing Date, true and correct in all material respects.

2.    Except as may be set forth on **Schedule 2** attached hereto, Buyer has performed or observed in all material respects all covenants and agreements set forth in the Agreement to be performed or observed by Buyer at or prior to the Closing Date.

3.    All Schedules attached hereto are incorporated into and made a part of this Certificate for all purposes.

IN WITNESS WHEREOF, Buyer has executed this Certificate effective as of this _____ day of ___, 2016 (the "**Closing Date**").

**IGT**

By: _____
Name:_____
Title:_____
Date:_____

**EXHIBIT A-2**
**FORM OF CERTIFICATE OF SECRETARY TO BUYER**

**IGT**
**CERTIFICATE OF SECRETARY**

I, Michael K. Prescott, do hereby certify that:

1.    I am the duly elected, qualified and acting Secretary of IGT, a Nevada corporation (the "Company").

2.    Attached hereto as Exhibit A is a true and correct copy of resolutions duly adopted by the sole member of the Board of Directors of the Company on ____ _____,    2016,    and    that    said resolutions have not been altered, amended or rescinded in any respect and have been in full force and effect at all times since their adoption, up to and including the date hereof.

3.    Attached hereto as Exhibit B is a copy of the good standing certificate with respect to the Company from the Nevada Secretary of State.

4.    The person set forth below is the duly elected or appointed, qualified and acting sole Director of the Company (the "**Director**") holding the position set forth opposite his name, the signature set forth opposite the Director's name and title is the true, authentic signature of the Director and the Director is authorized to execute and deliver on behalf of the Company the documents approved by the resolutions set forth on Exhibit A.

| NAME | TITLE | SPECIMEN SIGNATURE |
|------|-------|--------------------|
| Renato Ascoli | Director and President | _____ |

IN WITNESS WHEREOF, I have executed this Certificate in my official capacity as of the ____day of ____, 2016.

By: _____
Name: Michael K. Prescott
Title:  Secretary

**EXHIBIT B**
**FORM OF CONSULTING AGREEMENT**



### CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") dated and effective as of _____, 20___, (the "Effective Date"), is by and between _____, with an address at _____ (the "Consultant"), and **IGT**, with offices at 6355 South Buffalo Drive, Las Vegas, Nevada 89113 ("IGT" or the "Company").

In consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Consultant and IGT hereby agree as follows:

## 1.    DEFINITIONS

In this Agreement, the capitalized terms below shall have the corresponding meanings. (Additional terms are defined elsewhere in this Agreement.)

"Affiliate" means any entity that controls, is controlled by or is under common control with IGT.

"Confidential Information" means any information, concerning in any way, IGT and its Affiliates, including, but not limited to, its technologies, products, services, inventions, software, customers, markets, business plans or strategies, regardless of medium of recordation, that is disclosed to, discovered or otherwise learned by the Consultant from IGT, provided however, that "Confidential Information" shall not include information (i) available to the public, other than as a result of a breach of this Agreement; (ii) already known to the Consultant at the time of such disclosure by IGT as documented by records kept in the ordinary course of Consultant's business and in the Consultant's possession pre-dating such disclosure; (iii) subsequently received by the

Consultant in good faith from a third party having the prior right to make such subsequent disclosure; or (iv) independently developed by the Consultant without use of Confidential Information and shown by Consultant's records kept in the ordinary course of business.

"Consultant" means the Consultant and its employees.

"Intellectual Property Rights" means any and all tangible and intangible property rights worldwide arising in any way from the services provided under this Agreement, including, but not limited to, rights in or to copyrights (including software and source code), patents, trade secrets, trademarks, service marks and mask works.

"Work Assignment" means a written description of the scope of work to be performed by the Consultant and any approved Subcontractor (as defined below) for each project under this Agreement. Each Work Assignment shall be subject to the terms and conditions of this Agreement.

## 2.    SERVICES

A.    The Consultant shall provide services to IGT as reflected and described in the Work Assignment, attached hereto and made part hereof

B.    IGT and each of its Affiliates shall have the right to request services under this Agreement and execute Work Assignments. Any Affiliate entering into a Work Assignment hereunder shall be referred to as "IGT" for purposes of the applicable Work Assignment only.

C.    The Consultant shall perform all services with due care, skill and diligence, in accordance with applicable laws and professional standards currently recognized by its profession, and to the satisfaction of IGT. The Consultant specifically acknowledges that time is of the essence.

## 3.    COMPENSATION AND EXPENSES

IGT shall pay the Consultant for services provided to IGT and reimburse the Consultant for reasonable documented expenses incidental thereto in accordance with the terms of attached Work Assignment. Any fees, costs or expenses not expressly set forth in the Work Assignment must be authorized by IGT in advance and in writing. Authorized expenses shall be borne directly by the Consultant and recharged to IGT at cost, when justified by supporting original documents.

For additional services provided on a time and materials basis, all invoices shall be accompanied by a detailed time-sheet describing the personnel and services rendered as well as the adequate supporting documentation for the authorized expenses.

## 4.    CONFIDENTIALITY

A.    Except as absolutely necessary to providing services pursuant to this Agreement, or unless specifically authorized in writing by IGT, the Consultant shall never, directly or indirectly, use, duplicate or disclose to others any Confidential Information, and the Consultant shall take all reasonable steps and shall do all things requested by IGT to prevent others from using, duplicating or disclosing Confidential Information and shall use no less care than Consultant uses to protect its own confidential information of like importance from unauthorized use, duplication or disclosure, but in no event less than a reasonable standard of care.

C.    Any permitted copy of documents or other media containing Confidential Information made by the Consultant shall bear all copyright, trademark, patent and other proprietary notices appearing on the original.

D.    All Confidential Information disclosed by or belonging to IGT is and shall remain the exclusive and valuable property of IGT.

E.    The Consultant does not hereby obtain any license or other interest in or to Confidential Information of IGT or the subjects thereof.

F.    The Consultant shall immediately notify IGT of any incidents where Confidential Information may have been disclosed or disclosure appears imminent.

G.    Immediately upon the expiration or earlier termination of this Agreement, or upon request by IGT at any time, the Consultant shall deliver to IGT all products, components and equipment provided by IGT, and all records or other things containing or embodying Confidential Information within the Consultant's possession or control and Consultant shall be responsible for obtaining the return of all such materials from any third

party and Subcontractors immediately upon such request.

H.    If the Consultant receives a subpoena or other administrative or judicial process compelling it to release any Confidential Information, the Consultant shall provide IGT with immediate written notice and shall cooperate with IGT in any action to prevent or limit such release.    Any Confidential Information so disclosed shall remain the Confidential Information of IGT and shall be treated as such by Consultant.

I.    This Section 4 of this Agreement shall survive the expiration or earlier termination of this Agreement without time limitation.

## 5.    INTELLECTUAL PROPERTY RIGHTS

A.    The Consultant acknowledges and agrees that IGT or its licensors shall be the sole owner of all creations, products, inventions or discoveries, which are conceived, created, developed under or in connection with this Agreement together with all Intellectual Property Rights related to the foregoing,  as soon as they exist. The Consultant warrants that it is entitled to acknowledge and agree to such transfer of rights to IGT, and has obtained all the rights and necessary authorizations from all employees and Subcontractors providing services hereunder, in order to do so.

B.    The Consultant shall cooperate in good faith to facilitate the full exercise or exploitation by IGT of any of its Intellectual Property Rights, and, where necessary, do all acts and procedures required to obtain and perfect all Intellectual Property Rights in the name of IGT. The Consultant shall also in all circumstances refrain (and shall require its Subcontractors to refrain) from any actions or from any abuse of rights including moral rights, which would prejudice such ownership, exercise or exploitation by IGT.

C.    Unless otherwise expressly set forth in a Work Assignment, all materials, including, without limitation, documents in written or pictorial forms, on magnetic or non-magnetic media, drawings, deliverable, designs, computer programs, source codes, apparatus or models, developed by the Consultant for IGT or its designees pursuant to this Agreement shall be and shall remain the property of IGT or its designees and are specifically Works Made for Hire as defined in the U.S. Copyright Act.  If any such developments do not quality as Works Made for Hire, Consultant hereby assigns all right, title and interest thereto to IGT and shall assist IGT as requested from time to time in executing any and all documents necessary to effectuate such assignment.

D.    All materials supplied by IGT to the Consultant shall remain the property of IGT or its licensors, and shall be returned to IGT, with all copies thereof, when the Consultant's assignment in the context of this Agreement is terminated,    for    whatever    reasons;    or immediately upon request by IGT, without need to justify such a request.  The Consultant shall be responsible to obtain the return of all such    materials    immediately    upon    such person(s)    ceasing    to    render    any    services hereunder to IGT.

E.    The obligations of the Consultant under this Section 5 shall survive any termination of this Agreement and shall remain in full force and effect thereafter.

## 6.    NON-COMPETITION AND DISTURBANCE OF BUSINESS RELATIONSHIPS

A.    During the term of this Agreement and for    twelve    (12)    months    thereafter,    the Consultant shall not, directly or indirectly, engage in any activity, alone or in conjunction with others, to the benefit of any business or endeavor which is reasonably deemed by IGT in

its sole discretion to be or about to be in competition with IGT, if such activity is similar or reasonably related to any activity engaged in by the Consultant and its employee(s) for IGT.

B.     During the term of this Agreement and for twelve (12) months thereafter, the Consultant shall not, directly or indirectly, disturb or interfere in any way with any business relationships between IGT and its existing or prospective dealers, customers, suppliers or other business associates, nor shall it assist anyone else to do so.

C.     This Section 6 of this Agreement shall survive the expiration or earlier termination of this Agreement for the time periods specified herein.

7.     PERMISSION

A.     The Consultant shall not disclose the contents of this Agreement to any other person or organization, with the exception of the Consultant's financial and legal advisors, unless the Consultant first obtains IGT's specific prior written permission to do so or is compelled to do so by order of a court having proper jurisdiction over the parties or the subject matter of this Agreement.

B.     The Consultant is hereby granted permission to include "IGT Global Solutions Corporation" on its resume.  However, such resume shall not reference any Confidential Information and such reference to IGT Corporation shall not be misleading in any way including, but not limited to, the scope of Consultant's business relationship with IGT.

C.     This Section 7 of this Agreement shall survive the expiration or earlier termination of this Agreement without time limitation.

8.     CODE OF CONDUCT

A.     The Consultant shall at all times throughout the duration of this Agreement comply fully with the Company's Code of Conduct, a copy of which is attached hereto as Exhibit 1 and made a part hereof, including any subsequent modifications thereto as to which the Consultant is notified, the terms and conditions of which are hereby incorporated herein by reference and made a part hereof. The Consultant is responsible for the breach of the Code of Conduct by the Consultant's employees.

B.     Simultaneously with the execution of this Agreement, the Consultant agrees to execute the Code of Conduct Certification attached hereto as Exhibit 2.

9.     TERM AND TERMINATION

A.     This Agreement shall commence on the Effective Date and shall continue for a period of twenty-four (24) months thereafter (the "Original Termination Date"), unless earlier terminated as set forth below.

IGT has the unconditional right to terminate any Work Assignment or this entire Agreement before expiration of its term by giving the Consultant sixty (60) calendar days prior written notice. Termination of any Work Assignment shall not affect any other Work Assignment unless indicated by IGT; provided, however, that termination of this Agreement shall terminate all outstanding Work Assignments.

B.     Notwithstanding the foregoing, no prior notice shall be required in case of termination for cause, such as (but not limited to) unjustified absence, fault or negligence of the Consultant, breach of any IGT policies, including, but not limited to, the Code of Conduct, confidentiality obligations or intellectual property rights as stated herein or

the failure to perform as described in applicable Work Assignments.

## 10.    NO ASSIGNMENT OR SUBCONTRACT

This Agreement shall not be assigned or subcontracted by the Consultant, in whole or in part, without the prior written consent of IGT. It shall be assignable by IGT to any Affiliate or to any person, firm or corporation which may become a successor in interest to IGT by purchase, merger or otherwise. Any assignment made in violation of this Section shall be void and of no force or effect.

## 11.    WARRANTY

A.    The Consultant represents and warrants that:

i.    the performance of this Agreement shall not breach any duty owed by the Consultant to any other person or business entity, or under any law, court order, or rule or regulation of a governmental body;

ii.    Consultant shall strictly comply with the descriptions and standards of and representations as to the services (including performance capabilities, completeness, specifications, configurations, standards, functions and other requirements) which are specified in the attached Work Assignment;

iii.    the services and deliverables shall not violate or in any way infringe upon the rights of third parties, including property, contractual, employment, trade secrets, proprietary information and non-disclosure rights, or any trademark, copyright or patent rights;

iv.    any software provided pursuant to the attached Work Assignment contains no "computer viruses" or other "contaminants," including any codes or instructions that may be used to access,

modify, delete, damage or disable any computer system; and

v.    Consultant is the lawful owner or licensee of any software or programs used in the performance of the services; such software or programs have been lawfully acquired by the Consultant and Consultant has the right to permit IGT and its designees access to or use of such software programs.

B.    If any services or deliverables fail to comply with any of the foregoing warranties, as applicable, Consultant shall promptly correct such failure at no additional charge to IGT. If such correction is not promptly provided, IGT may terminate the applicable Work Assignment or this Agreement and receive a full refund of any fees paid for such services and deliverables.

C.    The representations, agreements and warranties set forth in this Section 11 shall survive the expiration or earlier termination of this Agreement without time limitation.

## 12.    INTENTIONALLY OMITTED

## 13.    LIMITATION OF LIABILITY

IN NO EVENT SHALL IGT'S TOTAL AGGREGATE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY PROJECT HEREUNDER (INCLUDING, BUT NOT LIMITED TO, CLAIMS FOR NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, MISREPRESENTATION, OR OTHER CONTRACT OR TORT CLAIMS) EXCEED THE AMOUNT OF DAMAGES ACTUALLY INCURRED BY CONSULTANT UP TO THE AMOUNT OF THE TOTAL FEES PAYABLE BY IGT TO CONSULTANT AS REFLECTED IN THE ATTACHED WORK ASSIGNMENT.

IN NO EVENT SHALL IGT BE LIABLE FOR INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF

REVENUE, LOSS OF USE AND LOSS OF DATA), ARISING OUT OF THIS AGREEMENT OR ANY PROJECT HEREUNDER, (INCLUDING, BUT NOT LIMITED TO, CLAIMS FOR NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, MISREPRESENTATION, OR OTHER CONTRACT OR TORT CLAIMS) EVEN IF INFORMED OF THE POSSIBILITY THEREOF IN ADVANCE.

## 14.    RELATIONSHIP OF THE PARTIES

A.    The parties hereto are independent contractors. Nothing herein shall create the relationship of employer and employee, partnership, principal and agent, or joint venture. The Consultant shall not have the authority to bind IGT, nor shall the Consultant by act or omissions give the appearance to any person or organization that the Consultant has such authority.

B.    The Consultant agrees that it shall bear sole responsibility for verifying the immigration status and employment authorization of itself and its employee(s), and hereby certifies that the Consultant and its employee(s) are legally authorized to work in each and every location specified in the Work Assignment.    The Consultant must be able to show, if required, that all legal requirements regarding the Consultant's taxation, work permit or authorization, social security and police registration (if applicable) have been complied with.

## 15.    CHOICE OF LAW AND LEGAL PROCEEDINGS

A.    This Agreement is governed by and interpreted and enforced under the laws of the State of Nevada, without giving effect to its conflict of laws provisions and rulings.  In the event of disputes arising out of or relating to this Agreement, the parties shall endeavor to resolve such disputes without recourse to arbitration or litigation. If no agreement is

forthcoming, disputes regarding this Agreement shall be subject to the exclusive jurisdiction of the Nevada courts.

B.    The Consultant shall cooperate with and assist IGT in any litigation or other legal proceeding relating to this Agreement or work performed by the Consultant under this Agreement, brought by or against third parties and involving IGT or its Affiliates, successors or assigns or its or their officers, directors or employees.

C.    This Section 15 of this Agreement shall survive the expiration or earlier termination of this Agreement without time limitation.

## 16.    GENERAL

A.    This Agreement is effective on the Effective Date.   This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

B.    All notices, demands, consents and other communications required or permitted under this Agreement shall be in writing and deemed given when sent: (i) by certified mail, return receipt requested, or (ii) by private overnight delivery service (e.g., Federal Express, Courier, Airborne or UPS), to the address of the party set forth on the first page of this Agreement, or to such other address as notified by the party hereto in accordance with this Agreement.

C.    In case any one or more of the provisions contained in the Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the enforceability of any other provision of this Agreement. If any one or more of the provisions contained herein shall for any reason be held by a court having jurisdiction over the parties and this Agreement to be excessively broad as to

duration, scope, activity or subject, it shall be construed, by limiting or reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

D.    Failure by either party of this Agreement to enforce any provision of this Agreement shall not be deemed a waiver of that or any other provision.

E.    The Consultant and IGT shall not be liable for any failure or delay in performance due to any cause beyond their respective control.

F.    This Agreement may be amended only by a writing executed by IGT and the Consultant. The Consultant acknowledges that it has read this Agreement, and agrees that it is the complete and exclusive statement of the Agreement between the parties, and supersedes all prior proposals and understandings, oral or written, relating to the subject matter of this Agreement.

G.    This Agreement shall be binding upon and inure to the benefit of IGT, its legal representatives and assignees and upon the Consultant, its legal representatives, successors, or permitted assignees, if any, under this Agreement.

H.    The Consultant acknowledges that a violation of this Agreement may cause serious, immediate and irreparable harm to IGT. Therefore, the Consultant agrees that in addition to any other legal or equitable remedies available to IGT for the enforcement of the terms hereof, IGT shall be entitled to seek specific performance or injunctive relief against any actual or actively contemplated

violation of this Agreement. Furthermore, the Consultant shall promptly reimburse IGT for any fees and other expenses incurred by it in pursuit of said performance or relief, provided IGT is successful in obtaining said performance or relief.

I.    The Consultant acknowledges and agrees that this Agreement is subject to the satisfactory results, as determined by IGT, of a background investigation on the Consultant and its key employees (including, without limitation, all employees assigned to perform services for IGT). The Consultant further agrees to cooperate in any due diligence or other inquiry conducted by a IGT customer or any appropriate governmental agency on behalf of a customer or in connection with a procurement, with respect to the Consultant and its directors, officers, employees and stockholders.

J.    The headings used in this Agreement are for convenience only and shall not be considered part of the Agreement.

L.    This Agreement shall be construed without regard to any presumption or rule requiring construction of interpretation against the party drafting or causing any instrument to be drafted.

M.    In the event of a conflict between the terms of this Agreement and any Work Assignment, the terms of this Agreement shall prevail.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

| Consultant | IGT |
|---|---|
| Signature: _____ | Signature: _____ |
| Print Name: _____ | Print Name: _____ |
| | Title: _____ |

**EXHIBIT C**
**NEVADA LAWSUIT RELEASE**

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "**Settlement Agreement**") is entered into as of _____, 2016 (the "**Settlement Date**"), between IGT, a Nevada corporation, with principal offices at 6355 South Buffalo Drive, Las Vegas, Nevada 89113 ("**IGT**") and **LEAP FORWARD GAMING, INC.** ("**LFG**"), a Nevada corporation having its principal place of business at 10589 Double R Boulevard, Reno, Nevada 89521, Mohammad Ali Saffari, an individual ("**Saffari**"), Perry Cobb, an individual ("**Cobb**") and Bruce Cunningham, an individual ("**Cunningham**," and together with LFG, Saffari and Cobb, "**Defendants**"). IGT, LFG, Saffari, Cobb and Cunningham may be referred to below individually as a "**Party**" and together as the "**Parties**."

### RECITALS

Whereas, a dispute arose between the Parties that resulted in the Litigation (defined below);

Whereas, the Parties would like to resolve the Litigation and Allegations (defined below) upon the terms and conditions of this Settlement Agreement.

Now therefore, in consideration for the foregoing, the covenants hereafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

1.    **DEFINITIONS**

1.1    "**Affiliate**" means, with respect to a Person, any other Person that, as of the Settlement Date, controls, is controlled by or is under common control with the first Person, but only for so long as such control exists.  A Person automatically will be deemed to control another Person if such first Person owns, directly or indirectly, more than fifty percent (50%) of the securities or other ownership interests representing equity, the voting stock, or general partnership interest of such other Person.  A person automatically will be deemed to be under common control with another person if more than fifty percent (50%) of the securities or other ownership interests representing the equity, the voting stock, or general partnership interest of the two Persons are directly or indirectly owned by the same Person or group of Persons.

1.2    "**Allegations**" means claims, counterclaims, causes of action, and allegations described in the Litigation as well as all other claims, counterclaims, causes of action or allegations that (a) were or could have been made in the Litigation (without regard to any jurisdictional bars) or (b) are based upon the facts and circumstances described in any of the pleadings of the Litigation.

1.3    "**Asset Purchase Agreement**" means the Asset Purchase Agreement dated as of June 30, 2016 by and among  LFG, Saffari and IGT.

1.3 "**Litigation**" means *International Game Technology and IGT vs. Leap Forward Gaming, Inc.*, Case No.: 2:15-ev-01842-APG-VCF pending in the United States District Court, District of Nevada.

1.4 "**Person**" means any natural person, corporation, limited liability company, association, company, governmental authority, partnership, or other legal entity.

2. **SETTLEMENT**

2.1 In consideration of the releases granted in Section 3.1 below, in settlement of the Litigation and Allegations, LFG and Saffari shall enter into the Asset Purchase Agreement and shall consummate the sale of the Purchased Assets in accordance with the terms of the Asset Purchase Agreement on the Closing Date (as defined in the Asset Purchase Agreement).

2.3 If LFG and Saffari fail to sell the Purchased Assets to IGT in accordance with the terms of the Asset Purchase Agreement on the Closing Date, this Settlement Agreement shall be null and void and of no force and effect.

3. **RELEASES / JUDGMENT**

3.1 Effective upon sale of the Purchased Assets in accordance with Section 2.1, IGT, on behalf of itself, its Affiliates, and each of their respective agents, employees, servants, officers, directors, representatives, predecessor and successor companies, assigns, attorneys, insurers, partnerships, stockholders, consultants, contractors, trustees, and members, and the predecessors, assigns, and successors in interest or any persons claiming by, through, on behalf of, or under any of the foregoing (collectively, "**IGT Releasing Persons**"), releases, forgives, acquits, covenants not to sue and forever discharges LFG, Saffari, Cobb, Cunningham, each of their Affiliates, and each of their respective agents, employees, servants, officers, directors, representatives, predecessor and successor companies, assigns, attorneys, insurers, partnerships, stockholders, consultants, contractors, trustees, and members, and the predecessors, assigns, and successors in interest or any persons claiming by, through, on behalf of, or under any of the foregoing ("**LFG Released Persons**") from any and all manner of actions, causes of action, suits, claims, demands, judgments, liabilities, debts, damages, losses, costs, expenses, judgments, awards, interest, compensation, and proceeds, whether based in tort, contract, strict liability or other theory, arising in law or in equity, fixed or contingent, known or unknown, foreseeable or not, certain or contingent, disclosed or undisclosed, or asserted or not (all of the foregoing, collectively "**Losses**"), in each case, that any IGT Releasing Person or any of its Affiliates had, now has or may have had or may hereafter discover without regard to the subsequent discovery or existence of different or additional facts against any LFG Released Persons related to the Litigation or the Allegations.

3.2 Effective upon sale of the Purchased Assets in accordance with Section 2.1, LFG, on behalf of itself, its Affiliates, and each of their respective agents, employees, servants, officers, directors, representatives, predecessor and successor companies, assigns,

attorneys, insurers, partnerships, stockholders, consultants, contractors, trustees, and members, and the predecessors, assigns, and successors in interest or any persons claiming by, through, on behalf of, or under any of the foregoing (collectively, "**LFG Releasing Persons**"), releases, forgives, acquits, covenants not to sue and forever discharges IGT, its Affiliates, and each of their respective agents, employees, servants, officers, directors, representatives, predecessor and successor companies, assigns, attorneys, insurers, partnerships, stockholders, consultants, contractors, trustees, and members, and the predecessors, assigns, and successors in interest or any persons claiming by, through, on behalf of, or under any of the foregoing ("**IGT Released Persons**") from any and all manner of Losses, in each case, that any LFG Releasing Person or any of its Affiliates had, now has or may have had or may hereafter discover without regard to the subsequent discovery or existence of different or additional facts against IGT Released Persons related to the Litigation or the Allegations. Nothing herein shall limit or restrict LFG's right to prosecute and defend all appropriate claims against Andrew Novotak, Jr.

4.  **DISMISSAL OF LITIGATION**

4.1  To the extent not already done, within 14 days of the Settlement Date, each of the parties to the Litigation will prepare, execute and file whatever documentation is required to jointly obtain a dismissal of the Litigation, with prejudice. The Parties agree that any claims dismissed without prejudice will be treated as dismissed with prejudice.

5.  **REPRESENTATIONS**

5.1  Each Party represents that as of the Settlement Date and upon sale of the Purchased Assets in accordance with Section 2.1: (A) it is a valid and existing corporation in good standing under the laws of the state or country of its incorporation; (B) it has the power and authority required to carry on its activities as they are now conducted; (C) it has the full legal right and corporate power, without the consent of any other person to execute, deliver and to perform its obligations under this Settlement Agreement; (D) all corporate and other actions required to be taken by it to authorize the execution, delivery and performance of this Settlement Agreement and all transactions contemplated hereby have been duly and properly taken; (E) no consent, approval, authorization or filling of any certificate, notice application, report or other document with any governmental authority is required on the part of such Party in connection with the valid execution and delivery of this Settlement Agreement or the performance by such Party of any of its obligations hereunder; and (F) the execution, delivery and performance of this Settlement Agreement do not violate or conflict with any law applicable to it, any provision of its charter or bylaws, any order or judgment of any court or other agent of government applicable to it or any of its assets, or any contractual restriction binding on or affecting it or any of its assets.

6.    **CONFIDENTIALITY**

6.1    The Parties will maintain the existence and terms and conditions of this Settlement Agreement in confidence and will not, without the prior written consent of the other Party, disclose, confirm or otherwise discuss any of the foregoing to or with any third party, except (a) to the LFG Released Persons or IGT Released Persons (as applicable) and the Parties' respective accountants, lawyers, tax advisors, insurance carriers and bankers, in each case on a strictly need to know basis and only pursuant to an obligation of confidentiality that prevents further disclosure by each such person; (b) to the limited extent required by law or regulation, including to any gaming jurisdiction regulators or the Securities and Exchange Commission or in connection with any dispute resolution process (e.g., court order, subpoena, etc.), provided that the Parties use reasonable efforts to prohibit disclosure, including through redaction, filing under seal or protective order as available; and (c) to Macquarie Capital (USA) and MIHI, LLC and their Affiliates. The foregoing restrictions do not prohibit a Party from confirming or responding in response to inquiries merely the fact that the Parties have settled the Litigation.

7.    **MISCELLANEOUS**

7.1    Each Party is solely responsible for its costs and expenses incurred in connection with this Settlement Agreement.

7.2    Other than the Asset Purchase Agreement, this Settlement Agreement contains the entire understanding of the Parties with regard to the subject matter contained herein and thereon, and supersedes all prior agreements or understandings of the Parties with respect to the subject matter of this Settlement Agreement.

7.3    No alleged waiver, modification or amendment to this Settlement Agreement will be effective against either Party hereto, unless in writing, signed by the Party against which such waiver, modification or amendment is asserted. The failure or delay of either Party to insist upon the other Party's strict performance of the provisions in this Settlement Agreement or to exercise in any respect any right, power, privilege, or remedy provided for under this Settlement Agreement will not operate as a waiver or relinquishment thereof.

7.4    If any provision of this Settlement Agreement, or the application thereof, is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions of this Settlement Agreement will in no way be effected, impaired or invalidated, and to the extent permitted by applicable law, any such provision will be restricted in applicability or reformed to the minimum extent required for such provision to be enforceable.

7.5    This Settlement Agreement will be governed, interpreted and construed in accordance with the laws of the State of Nevada, USA (without regard to its conflict of law principles). Each Party agrees that, in regard to this Settlement Agreement, personal jurisdiction and venue will be proper in the state and federal courts situated in Nevada, USA and that any litigated dispute relating to this Settlement Agreement will be

conducted solely in such courts and any appellate courts with jurisdiction over the litigated dispute. Each of the Parties hereby irrevocably submits with regard to any action or proceeding arising out of or related to this Settlement Agreement, generally and unconditionally, to the exclusive jurisdiction of such courts. Disputes regarding this Agreement following the filing of the a voluntary petition for relief under Chapter 11 by LFG shall be subject to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Nevada.

7.6    This Settlement Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, but all such counterparts together will constitute but one and the same instrument.

IN WITNESS WHEREOF, LFG, Saffari, Cobb, Cunningham and IGT have, through their duly authorized representative, executed this Settlement Agreement as of the Settlement Date.

IGT

By_____

Printed Name_____

Title_____

Leap Forward Gaming, Inc.

By_____

Printed Name_____

Title_____

Mohammad Ali Saffari, an individual

By_____

Printed Name_____

Perry Cobb, an individual

By_____

Printed Name_____

Bruce Cunningham, an individual

By_____

Printed Name_____

**EXHIBIT D**
**OMITTED**

**EXHIBIT E**
**FORM OF BILL OF SALE**

**BILL OF SALE**

This BILL OF SALE (this "Bill of Sale") is made and delivered this ___ day of ____, 2016, by Leap Forward Gaming,, Inc., a Nevada corporation ("Seller") for the benefit of IGT, a Nevada corporation ("Buyer"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement (as hereinafter defined).

WHEREAS, Seller and Buyer have entered into that certain Asset Purchase Agreement dated as of June 30, 2016 (the "Agreement"), the terms of which are incorporated herein by reference, which provides, among other things, for the sale and assignment by Seller to Buyer of the Purchased Assets.

NOW, THEREFORE, in consideration of the mutual promises contained in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Seller, and subject to the terms and conditions of the Agreement:

1.    Seller does hereby bargain, sell, grant, assign, transfer, convey and deliver unto Buyer, and its successors and assigns, forever, all of Seller's right, title and interest in and to the Purchased Assets TO HAVE AND TO HOLD such Purchased Assets with all appurtenances thereto, unto Buyer, and its successors and assigns, for its use forever.

2.    This Bill of Sale shall inure to the benefit of and be binding upon the parties thereto and their respective successors and assigns.

3.    Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Agreement. To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the terms of the Agreement, the Agreement shall govern.

4.    This Bill of Sale is executed and delivered pursuant to the Agreement.

5.    This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of Nevada, as applied to contracts made and performed entirely in such State.

IN WITNESS WHEREOF, and intending to be legally bound hereby, Seller has caused this Bill of Sale to be executed and delivered as of the day and year first above written.

**LEAP FORWARD GAMING, INC.**


By: _____

Name:_____

Title: _____

**EXHIBIT F**
**FORM OF NON-COMPETITION AGREEMENT**

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

This **NON-COMPETITION AND NON-SOLICITATION AGREEMENT** ("**Agreement**") is made, entered into and executed as of the _____ day of ___, 2016, by and between (the "**Executive**") and IGT, a Nevada corporation (the "**Company**").

### W I T N E S S E T H:

WHEREAS, the Company has entered in that certain Asset Purchase Agreement (the "**Asset Purchase Agreement**") with Leap Forward Gaming, Inc., a Nevada corporation, dated the date of this agreement, and capitalized terms used herein shall have the meaning ascribed to such terms in the Asset Purchase Agreement; and

WHEREAS, pursuant to the Asset Purchase Agreement, the Company and Seller have agreed that the certain members of the Seller's senior management would enter into agreements to refrain from entering into competition with and/or engaging in solicitation with respect to the Products in the Gaming Market (the "**Business**"); and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Executive hereby agree as follows:

### ARTICLE I
### COVENANTS AGAINST COMPETITION AND SOLICITATION

1.1     The Executive recognizes and acknowledges that the Company is placing its confidence and trust in the Executive and has entered into the Asset Purchase Agreement, in part, based on the Executive's agreement pursuant to this Article I.

1.2     For a period of two years following the Closing Date, Executive shall not cause, solicit, induce or encourage any employees of Seller who are or become employees of Company to leave such employment or hire, employ or otherwise engage any such individual.

1.3     For a period of two years following the Closing Date, Executive shall not: (a) cause, induce or encourage any material actual or prospective client, customer, supplier, or licensor of the Business, (including any existing or former customer of Seller and any Person that becomes a client or customer of the Business after the Closing) or any other Person who has a material business relationship with the Business, to terminate or change any such actual or prospective relationship in a manner which would be materially adverse to the Business; or (b) either directly or indirectly be or become an employee, agent, consultant or representative of or become a director or officer of or be otherwise in any manner associated with any person, firm, corporation, association or other entity that is engaged in or currently intends to become engaged in on any business that competes with the Business of the Company (i) involving the provision of any Products and services currently provided by Sellers in connection with the Business or (ii) that is otherwise substantially competitive with the Business related to the Products as defined in the Asset Purchase Agreement (a "**Restricted Business**"); or (iii) either directly or indirectly be or become a shareholder, joint venturer in or owner (in whole or in part) of or be a partner of or associated with or have any proprietary or financial interest in any firm,

corporation, joint venture, partnership or association or other entity that is engaged in or is carrying on any business that competes with the Business of the Company . This covenant shall apply worldwide. All references to the "**Company**" shall include all subsidiaries of the Company and any successor thereof, and the covenants included herein shall extend to all such entities. Notwithstanding anything herein to the contrary, in no event shall the restrictions contained in this Agreement restrict the acquisition by Executive, directly or indirectly, of less than 2% of the outstanding capital stock of any publicly traded company engaged in a Restricted Business.

1.4     Breach. The Executive hereby recognizes and acknowledges that irreparable injury or damage shall result to the Company in the event of a breach or threatened breach by the Executive of any of the terms or provisions of this Agreement, and the Executive therefore agrees that the Company shall be entitled to an injunction restraining the Executive from engaging in any activity constituting such breach or threatened breach. Nothing contained herein shall be construed as prohibiting the Company from pursuing any other remedies available to the Company at law or in equity for such breach or threatened breach, including, but not limited to, the recovery of damages from the Executive and, if the Executive is an employee of the Company, terminating the Employment of the Executive in accordance with the terms and provisions of this Agreement.

## ARTICLE II
### MISCELLANEOUS

2.1     Notices. Any notices to be given hereunder by either party to the other may be effected either by personal delivery in writing or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices shall be addressed to the parties at the following addresses:

If to the Company:          IGT
                            6355 S. Buffalo Drive
                            Las Vegas, NV 89113
                            Attn: General Counsel
                            Phone: +1 702 669-7777


If to the Executive:


Any party may change his or its address by written notice in accordance with this Section 2.1. Notices delivered personally shall be deemed communicated as of actual receipt, and except as otherwise provided herein, mailed notices shall be deemed communicated as of three days after proper mailing.

2.2     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada as applied made and performed entirely in such state, and the parties hereby irrevocably submit to the exclusive jurisdiction of each such court in any such action or proceeding and waives any objection it may now or hereafter have to venue or convenience of forum.

2.3     Waiver. No term or condition of this Agreement shall be deemed to have been waived nor shall there be any estoppel to enforce any of the terms or provisions of this Agreement except by written instrument of the party charged with such waiver or estoppel. Further, it is agreed that no

waiver at any time of any of the terms or provisions of this Agreement shall be construed as a waiver of any of the other terms or provisions of this Agreement and that a waiver at any time of any of the terms or provisions of this Agreement shall not be construed as a waiver at any subsequent time of the same terms or provisions.

2.4     Amendments.  No amendment or modification of this Agreement shall be deemed effective unless and until executed in writing by all of the parties hereto.

2.5     Severability.  All agreements and covenants contained herein are severable and, in the event any of them shall be held to be invalid by any competent court, this Agreement shall be interpreted as if such invalid agreements or covenants ware not contained herein.  Should any court or other legally constituted authority determine that for any such agreement or covenant to be effective, it must be modified to limit its duration or scope, the parties herein shall consider such agreement or covenant to be amended or modified with respect to duration and scope so as to comply with the orders of any such court or other legally constituted authority or to be enforceable under the laws of the State of Nevada, and as to all other portions of such agreement or covenants they shall remain in full force and effect as originally written.

2.6     Headings.  All headings set forth in this Agreement are intended for convenience only and shall not control or affect the meaning, construction or effect of this Agreement or of any of the provisions thereof.

2.7     Assignment.  Neither this Agreement nor any of the rights, interest or obligations hereunder shall be assigned by either party without the prior written consent of the other party to this Agreement.

IN WITNESS WHEREOF, the parties hereto have set their hands as of the date first above written.

**IGT:**

_____

By: _____
Its: _____

**EXECUTIVE:**

_____

Name: _____

**EXHIBIT G-1**
**FORM OF SELLER'S BRINGDOWN CERTIFICATE**

## SELLER'S BRINGDOWN CERTIFICATE
### ("Certificate")

Leap Forward Gaming, Inc., a Nevada corporation (the "Seller") in connection with that certain Asset Purchase Agreement dated as of June 30, 2016 entered into between Seller and IGT, a Nevada corporation ("Buyer"), in accordance with the terms of the Agreement, does hereby certify to the Seller the following as to the Closing Date, as hereinafter defined:

1. Except as may be disclosed on **Schedule 1** attached hereto and subject to any qualifications that may be set forth in the Agreement, the warranties and representations of Seller set forth in <u>Section 5</u> of the Agreement are, as of the Closing Date, true and correct in all material respects.

2. Except as may be set forth on **Schedule 2** attached hereto, Seller has performed or observed in all material respects all covenants and agreements set forth in the Agreement to be performed or observed by Seller at or prior to the Closing Date.

3. All Schedules attached hereto are incorporated into and made a part of this Certificate for all purposes.

IN WITNESS WHEREOF, Seller has executed this Certificate effective as of this _____ day of ____, 2016 (the "**Closing Date**").


**LEAP FORWARD GAMING, INC.**


By:     _____
Name:_____
Title:_____
Date:_____

EXHIBIT G-2
FORM OF CERTIFICATE OF SECRETARY TO SELLER

**LEAP FORWARD GAMING, INC.**
**CERTIFICATE OF SECRETARY**

I, _____, do hereby certify that:

1.    I am the duly elected, qualified and acting Secretary of Leap Forward Gaming, Inc. a Nevada corporation (the "Company").

2.    Attached hereto as <u>Exhibit A</u> is a true and correct copy of resolutions duly adopted by the Board of Directors of the Company on ____ _____, 2016, and that said resolutions have not been altered, amended or rescinded in any respect and have been in full force and effect at all times since their adoption, up to and including the date hereof.

3.    Attached hereto as <u>Exhibit B</u> is a copy of the good standing certificate with respect to the Company from the Nevada Secretary of State.

4.    The persons set forth below are duly elected or appointed, qualified and acting Directors of the Company (the "**Directors**") holding the positions set forth opposite their names, the signatures set forth opposite the Directors' names and titles are the true, authentic signatures of the Directors and the Directors are authorized to execute and deliver on behalf of the Company the documents approved by the resolutions set forth on <u>Exhibit A</u>.

|          NAME          |          TITLE          |   SPECIMEN SIGNATURE   |
| ---------------------- | ----------------------- | ---------------------- |
| _____  | _____   | _____  |
| _____  | _____   | _____  |

IN WITNESS WHEREOF, I have executed this Certificate in my official capacity as of the ____day of _____, 2016.

By: _____

Name:

Title:  Secretary

**EXHIBIT H-1**
**PATENT ASSIGNMENT**

## PATENT ASSIGNMENT

This Assignment is executed by Leap Forward Gaming, Inc. (hereinafter "**Leap Forward**"), a corporate duly organized and existing under the laws of Nevada and having its principal office and place of business at 10589 Double R Boulevard, Reno Nevada 89521.

**IGT** is a corporation duly organized and existing under the laws of Nevada and having its principal office and place of business at 6355 South Buffalo Drive, Las Vegas, NV 89113.

**IGT** desires to obtain, any and all right, title, and interest that **Leap Forward** has in and to:

(1)     the patents (collectively, the "**Patents**") and the patent applications (collectively, the "**Patent Applications**") listed in Exhibit A attached to this Assignment; and

(2)     any and all inventions disclosed in the **Patents** and the **Patent Applications** (collectively, the "**Inventions**").

For valuable consideration received, **Leap Forward** hereby sells, assigns, transfers, and sets over unto **IGT**, its successors, assigns, nominees, and legal representatives any and all right, title, and interest that **Leap Forward** has in and to the **Patents**, the **Patent Applications**, and the **Inventions** worldwide, to be held and enjoyed by **IGT**, its successors, assigns, nominees, and legal representatives as fully and entirely as the same would have been held and enjoyed by **Leap Forward** had this Assignment not been made, including, without limitation:

(1)     any and all right, title, and interest **Leap Forward** has to make applications for patent that claim priority in whole or in part, directly or indirectly, to any of the **Patents** or the **Patent Applications**;

(2)     any and all right, title, and interest **Leap Forward** has in and to any patents issuing from the **Patent Applications** and in and to any patents issuing from any applications for patent claiming priority in whole or in part, directly or indirectly, to any of the **Patents** or the **Patent Applications**; and

(3)     any and all rights **Leap Forward** has to sue for any past, present, and future infringement of the **Patents**, any patents issuing from the **Patent Applications**, and any patents issuing from any applications for patent claiming priority in whole or in part, directly or indirectly, to any of the **Patents** or the **Patent Applications**, including, without limitation, the right to collect and receive any damages, royalties, or settlements for such infringements and the right to sue for injunctive or other equitable relief.

**Leap Forward** hereby covenants and agrees through its employees, agents, officers, directors, and shareholders that **Leap Forward** will, upon request of **IGT**, its successors, assigns, nominees, and legal representatives and without further remuneration, fully cooperate with **IGT** in procuring any of the

**Patent Applications** and any applications for patent claiming priority in whole or in part, directly or indirectly, to any of the **Patents** or the **Patent Applications**.

**Leap Forward** hereby covenants and agrees through its employees, agents, officers, directors, and shareholders that **Leap Forward** will, upon request of **IGT**, its successors, assigns, nominees, and legal representatives and without further remuneration, execute and deliver any papers that may be reasonably necessary to **IGT's**, its successors', assigns', nominees', and legal representatives' full enjoyment, protection, enforcement, and title in and to the **Patents**, the **Patent Applications**, and the **Inventions** including, but not limited to, all oaths, declarations, affidavits, and attestations for and related to the **Patents**, the **Patent Applications**, and the **Inventions**.

**Leap Forward** hereby covenants and agrees through its employees, agents, officers, directors, and shareholders that **Leap Forward** will, upon request of **IGT**, its successors, assigns, nominees, and legal representatives and without further remuneration, provide any information, testify in any legal proceeding, and take any other actions that may be reasonably necessary to **IGT's**, its successors', assigns', nominees', and legal representatives' full enjoyment, protection, enforcement, and title in and to the **Patents**, the **Patent Applications**, and the **Inventions**.

**LEAP FORWARD**

<u>Signature</u>                                      <u>Date Signed</u>

By: _____        _____

Name: _____

Title: _____

Company:    <u>Leap Forward Gaming, Inc.</u>

                    <u>10589 Double R Boulevard</u>

                    <u>Reno, Nevada 89521</u>


The person whose name is subscribed to the foregoing instrument personally appeared before me and executed the foregoing instrument in my presence for the purpose contained therein by signing his/her name hereto.

<u>Signature</u>                                      <u>Date Signed</u>

_____           _____

**IGT**

Signature                                                Date Signed

By: _____                _____

Name: _____

Title: _____

Company: <u>IGT                                    .</u>
               <u>6355 South Buffalo Drive     </u>
               <u>Las Vegas, NV 89113          </u>


The person whose name is subscribed to the foregoing instrument personally appeared before me and executed the foregoing instrument in my presence for the purpose contained therein by signing his/her name hereto.

Signature                                                Date Signed

_____                _____

EXHIBIT A

## Patents

| Patent Num. | Appl. Num. | Title | Priority | Issue Date |
|---|---|---|---|---|
| 8,083,592 | 12/943,792 | Apparatus and method for retrofitting candle devices on a gaming machine | 2/10/2010 | 12/27/2011 |
| 8,088,014 | 12/943,789 | Gaming device and method for wireless gaming system providing non-intrusive processes | 2/10/2010 | 1/3/2012 |
| 8,241,119 | 12/943,797 | Candle devices for gaming machines | 2/10/2010 | 8/14/12 |
| 8,282,480 | 13/327,566 | Candle device for providing transaction verification on a gaming machine | 2/10/2010 | 10/9/2012 |
| 8,317,604 | 13/294,064 | Apparatus and method for retrofitting candle devices on a gaming machine | 2/10/2010 | 11/27/2012 |
| 8,336,697 | 12/943,798 | Device health monitoring for gaming machines | 2/10/2010 | 12/25/2012 |
| 8,371,937 | 13/300,344 | Gaming device and method for wireless gaming system providing non-intrusive processes | 2/10/2010 | 2/12/2013 |
| 8,460,091 | 13/086,218 | Remote power reset feature on a gaming machine | 2/10/2010 | 6/11/2013 |
| 8,479,908 | 13/671,394 | Device health monitoring for gaming machines | 2/10/2010 | 7/9/2013 |
| 8,696,430 | 13/890,692 | Device health monitoring for gaming machines | 2/10/2010 | 4/15/2014 |
| 8,696,449 | 13/738,774 | Gaming device and method for wireless gaming system... | 2/10/2010 | 4/15/2014 |
| 8,814,681 | 13/327,584 | Candle device for generating display interfaces... | 2/10/2010 | 8/26/2014 |
| 8,814,706 | 14/027,111 | Radio candle mount | 2/10/2010 | 8/26/2014 |
| 8,882,589 | 14/207,476 | Device health monitoring for gaming machines | 2/10/2010 | 11/11/2014 |
| 8,968,086 | 14/027,112 | Video processing and signal routing apparatus... | 2/10/2010 | 3/3/2015 |
| 9,022,861 | 14/320,250 | Device health monitoring for gaming machines | 2/10/2010 | 5/5/2015 |
| 9,245,419 | 14/710,549 | Lottery games on an electronic gaming machine | 2/10/2010 | 1/26/2016 |
| 9,240,100 | 14/043,724 | Method and apparatus for video display... | 2/10/2010 | 1/19/2016 |

## Patent Applications

| Patent Num. | Appl. Num. | Title | Priority | Issue Date |
|---|---|---|---|---|
| ending | 14/608,149 | Video processing and signal routing apparatus ... | 2/10/2010 | TBD |
| ending | 14/949,982 | Lottery games on an electronic gaming machine | 2/10/2010 | TBD |
| ublished | 14/970,332 | Method and apparatus for video display... | 2/10/2010 | TBD |

**EXHIBIT H-2**
**CERTIFIED COPIES OF PATENT RECORDATION COVER SHEETS**

**EXHIBIT I**
**TRADEMARK ASSIGNMENT**

## TRADEMARK ASSIGNMENT AGREEMENT

This TRADEMARK ASSIGNMENT AGREEMENT (this "Assignment") is entered into as of _____ _____, 2016 (the "Effective Date"), by and between Leap Forward Gaming, Inc., a Nevada corporation having its principal place of business at 10589 Double R Boulevard, Reno, Nevada 89521 ("Assignor") and IGT, a Nevada corporation having a place of business at 6355 South Buffalo Drive, Las Vegas, Nevada 89113 ("Assignee" and together with Assignor, each a "Party" and collectively the "Parties").

WHEREAS, Assignor holds ownership rights in and to the trademarks, trademark registrations, trademark registration applications, service marks, service mark registrations and service mark registration applications identified on Schedule A, and the goodwill associates therewith and symbolized thereby ("Assigned Marks"):

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated June _, 2016, Assignor has agreed to sell, assign, transfer, convey and deliver to Assignee all of Assignors' right, title and interest in, to and under the Assigned Marks, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement; and

WHEREAS, Assignee is desirous of obtaining Assignor's entire right, title and interest in, to and under the Assigned Marks.

NOW THEREFORE, in consideration of the covenants and agreement contained herein and in the Asset Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    ASSIGNMENT

1.1   Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee, its successors, legal representatives and assigns, Assignor's entire right, title and interest in, to and under the Assigned Marks, including, without limitation, Assignor's rights to (a) recover damages for any all past, current or future infringements or other violations thereof, (b) apply for, revive and maintain all registrations, renewals and/or extensions thereof, (c) file applications, revive abandoned applications and registrations, and make claims of priority to the Assigned Marks under the trademark laws of the United States, the International Convention for the Protection of Industrial Property, and any other international agreement o convention or the domestic laws of any county in which such application is filed, and (d) grant licenses or other interests therein; provided that, with respect to any Assigned Marks that have United State intent-to-use trademark applications for which an affidavit of use has not yet been filed, the transfer and assignment of such applications shall not be effective until the expiration of any period during which the assignment thereof would impair, under applicable federal law, the registrability of such applications or the validity or enforceability of registrations issuing from such applications.

1.2    Assignor hereby authorizes and requests the Commissioner of Patents and Trademarks of the United States, and any official of any country or countries foreign to the United States (including any official empowered or authorized by international agreement or convention to issue patents pursuant to such agreement or convention), whose duty it is to issue trademarks on applications as aforesaid, to record Assignee as the owner of the Assigned Marks.  Assignee shall have the right to record this Assignment with all applicable governmental authorities and registrars so as to perfect its ownership of the Assigned Marks.

## 2.    GENERAL PROVISIONS

2.1    <u>Assistance</u>.  Assignor hereby irrevocably designates and appoints Assignee and its duly authorized officers and agents as its agent and attorney in fact, which appointment is coupled with an interest, to act for and in its behalf t execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this paragraph with the same legal force and effect as if executed by the Assignor.

2.2    <u>Governing Law</u>.  This Assignment and any dispute hereunder shall be governed by and construed un accordance with the domestic laws of the State of Nevada, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Nevada or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Nevada.

2.3    <u>Counterparts</u>.   This Assignment may be executed in multiple counterparts (including by means of telecopied signature pages), any of which need not contain the signature of more than one Party, but all such counterparts taken together shall constitute one and the same instrument.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers or managers, as of the date first written above.

ASSIGNOR:
Leap Forward Gaming, Inc.

By: _____

     Name:
     Title:

State of                      )

                           )     SS

Country of                )

On this ____, day of _____ 2016, before me a Notary Public in and for the Country and State aforesaid personally appeared _____, to me known and known to me to the be person of that name who signed and sealed the foregoing instrument, and acknowledged the same to e o his free act and deed.

_____

Notary

My commission expires:   _____

ASSIGNEE:

IGT

By: _____

    Name:

    Title:

State of                 )

                    )  SS

Country of           )

On this ____, day of _____, 2016, before me a Notary Public in and for the Country and State aforesaid personally appeared _____, to me known and known to me to the be person of that name who signed and sealed the foregoing instrument, and acknowledged the same to e o his free act and deed.

_____

Notary

My commission expires: _____

## SCHEDULE A
## TRADEMARKS

| Registration Number | Application Number | Title | Filing Date | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| 3922979 | 85080283 | SaffariNet | 7/8/10 | 2/22/11 | 2/22/21 |
| 4001192 | 85079485 | Leap Forward Gaming | 7/7/10 | 7/26/11 | 7/26/21 |
| 4072839 | 85149199 | Leap Forward (logo) | 10/10/10 | 12/20/11 | 12/20/21 |
| 4503381 | 85887841 | SmartTable | 3/27/13 | 3/25/14 | 3/25/24 |
| 4503382 | 85887901 | Patron Display Interface | 3/27/13 | 3/25/14 | 3/25/24 |
| 4172219 | 85-091379 | Shahrazad | 7/23/10 | 7/10/12 | 7/10/22 |
| 4576139 | 85-142582 | Smartfloor | 9/30/10 | 7/29/14 | 7/29/24 |

SCHEDULE 1
DEFINED TERMS

Terms not otherwise defined in the body of this Agreement shall have the meaning set forth in this Schedule 1.

"**Affiliate**" means, with respect to a first Person, any other Person that directly or indirectly Controls, is Controlled by, or is under common Control with, such first Person.

"**Control**" including, its correlative meanings, "Controls", "Controlled by" and "under common Control with" means the possession, directly or indirectly, of the power to direct or cause direction of the management or policies of another Person (whether through ownership of securities or other ownership interests, by contract or otherwise).  A first Person will be presumed to Control another Person if such first Person actually owns or has beneficial ownership of at least 50% of the voting securities or other comparable equity interests of such other Person (whether directly, indirectly or pursuant to any option, warrant or other similar arrangement).

"**Gaming Market**" means: (a) the design, manufacture, sale, lease, delivery, installation, operation or maintenance of hardware and/or equipment (e.g. computers, computer terminals, on-line lottery terminals, instant ticket vending and dispensing machines, self-service terminals, gaming devices and machines, video lottery terminals, slot machines and amusement with prize machines) (collectively, "**Gaming Hardware**") and the design, development, sale, licensing, delivery, installation, operation or maintenance of software or game content (collectively, "**Gaming Software**") pertaining to the operation of games of chance or skill or pari-mutuel or fixed odds games (including lotteries, pari-mutuel betting, bingo, race tracks, jai alai, legalized bookmaking, off-track betting, casino games, racino, keno, lotto and sports betting or any play for fun (non-wagering) versions of the foregoing) (collectively, "**Games**") and the provision of any type of ancillary service or product related to or connected with the foregoing; (b) the management, ownership or operation of (i) Games; (ii) Gaming Hardware; (iii) Gaming Software; and (iv) sales channels (retail, interactive and mobile) and the exercise of any governmental power or authority granted to any member of Buyer in connection with any of the foregoing businesses set out at (i) to (iv) (including acting as operator/private manager of legal gaming licenses and concessions) and the provision of any products or services related to any of the foregoing businesses set out at (i) to (iv) (including, without limitation, marketing activities and services, player tracking activities and loyalty management, back-office software (player management tools), field service, field sales force management and security and consulting services to customers including software, telecommunications, marketing and other related advisory services or other ancillary tools and platform related services); and (c) any other business that is related to, or which is an extension, development or expansion of, any of the foregoing businesses described in clauses (a) and (b) above.

"**Knowledge**" means the actual knowledge of a particular fact or other matter after reasonable inquiry by any of the officers or directors of the Seller.

"**Liability**" means any claim, as defined by Section 101(5) of the Bankruptcy Code, including, without limitation, any indebtedness, obligation or other liability (whether or not absolute,

accrued, matured, contingent, liquidated, known, suspected, fixed or otherwise), fine, assessment, penalty, judgment, award, loss, claim, demand, damage or settlement respecting the Products.

"**Lien**" means any lien, claim, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including, without limitation, the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**LVS Agreement**" means an agreement between Las Vegas Sands Corporation (or an affiliate thereof) ("**LVS**") pursuant to which Buyer will have the opportunity to provide the Products or Buyer's products substantially similar to the Products to LVS upon terms and conditions satisfactory to Buyer in its sole discretion.

"**Nevada Lawsuit**" means International Game Technology and IGT vs. Leap Forward Gaming, Inc., Mohammad Ali Saffari, Perry Cobb and Bruce Cunningham, Case No.: 2:15-ev-01842-APG-VCF pending in the United States District Court, District of Nevada.

"**Permitted Encumbrances**" means those liens, claims and encumbrances accepted by Buyer in this Agreement.

"**Person**" means any individual, partnership, corporation, or other entity.

"**Products**" means SaffariNet, PDI, controller module, Targeted Marketing App, Rewards App, Interactive Bonusing App, Reserve Machine App, Interactive Couponing App, Games On-Demand App, Tournament App, Patron Messaging App, Convenience App, Social Media App, Service App, Integration App, SmartTable, and in-game hardware.

"**Publicly Available Software**" means each of (i) any software that contains, or is derived in any manner (in whole or in part) from, any software that is distributed as free software, open source software (e.g. Linux), or pursuant to similar licensing and distribution models; and (ii) any software that requires as a condition of use, modification, and/or distribution of such software that such software or other software incorporated into, derived from, or distributed with such software (a) be disclosed or distributed in source code form; (b) be licensed for the purpose of making derivative works; or (c) be redistributable at no or minimal charge. Publicly Available Software includes, without limitation, software licensed or distributed pursuant to any of the following licenses or distribution models similar to any of the following: (a) GNU General Public License (GPL) or Lesser/Library GPL (LGPL), (b) the Artistic License (e.g. PERL), (c) the Mozilla Public License, (d) the Netscape Public License, (e) the Sun Community Source License (SCSL), the Sun Industry Source License (SISL), and the Apache Server License

"**Representatives**" means with respect to any Person, the officers, directors, stockholders, employees, accountants, counsel, consultants, advisors and other agents of such Person.

"**Sale Order**" means the "Order Approving Sale Free and Clear of Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. 363(B) and 363(F)" to be entered by the Bankruptcy Court, in form and substance reasonably acceptable to Seller and Buyer.

"**TVC Agreement**" means an agreement between Thunder Valley Casino (or an affiliate thereof) ("**TVC**") pursuant to which Buyer will have the opportunity to provide the Products or Buyer's products substantially similar to the Products to TVC upon terms and conditions satisfactory to Buyer in its sole discretion.

## SCHEDULE 1.1(A)
## PURCHASED FIXED ASSETS

Purchased fixed assets include computer equipment and proprietary "test bed" equipment.

| Computer equipment | Serial number |
|---|---|
| Computer- Apple | QP0320XBDNR |
| Computer- Apple | QP03210ADNR |
| Computer- Apple | QP03210YDNR |
| Computer- Apple | W803215NDNM |
| Computer- Apple | W803231FDNM |
| Computer- Apple | W803212UDNM |
| Computer- Apple | W8032180DNM |
| Computer- Apple | W803230PDNM |
| Computer- Apple | QP042026DNM |
| Computer- Apple | QP04201YDNM |
| Computer- Apple | WQ0390YHDAS |
| Computer- Apple | WQ0390YJDAS |
| Computer- Apple | W804154WDAS |
| Computer- Apple | C2VFG9ToDHJF |
| Computer- Apple | CO2HL2J6F2GC |
| Computer- HP | 2UA0270S5V |
| Computer- HP | 2MD0320HTK |
| Computer- HP | 2UA0120YJ3 |
| Computer- HP | 2UA0281Y1M |
| Computer- HP | 2UA02809ZJ |
| Computer- HP | 2UA0491874 |
| Computer- HP | 2UA0500MTM |
| Computer- HP | 2UA0500ZK2 |
| Computer- HP | 2UA1030M6P |
| Computer- HP | 2UA1020QVW |
| Computer- HP | 2UA0491Y1L |
| Computer- HP | 2UA0491N02 |
| Computer- HP | 2UA20214LS |
| Computer- HP | 2UA20305PP |
| Computer- HP | 3CR3250YC4 |
| Computer- HP | 2UA33910YS |
| Computer- HP | 2UA33910YM |
| Copier (Kyocera) | AJK3013438 |
| Cyberpowerpc.com | 297791W5LEH2 |
| Firewall | 0017C5678FB0 |
| Firewall | 0017C5D81148 |
| Ipad | D4041DJ7Z38 |
| Ipad | DKWGD05NDKPH |

| | |
|---|---|
| Laptop -Apple | CO2K101TF24T |
| Laptop- Apple | W81038XFATM |
| Laptop- Apple | CO2FP1HXDH2M |
| Laptop- Apple | CO2FNLWNDH2G |
| Laptop- Apple | C02HL0HDDW47 |
| Laptop- Apple | C02HN6JQDV7L |
| Laptop- Apple | CO2JWC50DTY4 |
| Laptop- Apple | CO2JX0JBDTY4 |
| Laptop- Apple | CO2JN7MEDTY4 |
| Laptop- Asus | D79ECY023835 |
| Laptop- Asus | D79ECY023783 |
| Laptop- Asus | D79ECY023722 |
| Laptop- Dell | CNF9498QMM |
| Laptop- Dell | CNF9498QNF |
| Laptop- HP | 2CE05106Z7 |
| Laptop- HP | 2CE3350GWD |
| Laptop- HP | CNU422BMG3 |
| Mac Mini | CO7HC5R7DJD0 |
| Mac Mini | CO7KF4VMDWYL |
| Printer- HP | CNDY858944 |
| Printer- HP | JPDCF1P07M |
| Printer- HP | VNB3R71475 |
| security gateway(SSG-20) | S0164102007002234 |
| Server | 30070736 |
| Server | 100501157 |
| Server | CN20160092 |
| Server | CN2016006A |
| Server | USE122N1RC |
| Server | 00477-OEM-8420077 |
| Server tower- HP | MXQ0240F3V |
| Switch- Brocade | BZR2529H3PT |
| Switch- Brocade | BZS2529H3H8 |
| Switch- Brocade | BZU2535HOAR |
| Switch- Brocade | BZU2535HOAP |
| Switch- Brocade | BZU2535H061 |
| Switch- Brocade | BZU2535H05Y |
| Switch- Brocade | BZM0417009D |

| Test bed equipment | | Qty |
|---|---|---|
| 15-4329-00-EA | Kit, Brocade, FCX624S | 3 |
| 15-5775-00-A* | Assembly, 6.2" display, Advantage | 22 |
| 45-5327-00-B* | SCC assembly, P900, with software, 2GB | 200 |
| 45-5327-00-RMA | SCC assembly, P900, with software, 2GB | 19 |
| 45-5331-00-EA | SCC assembly, P830A1, with software | 1 |
| 46-5339-90-EA | PDI-A assy, analog, high res, serial/isolated touch | 43 |
| 46-5340-90-EA | PDI assembly, mola-D, digital, high-res | 5 |
| 46-5340-90-EA* | PDI-D assy, digital, high res, serial/isolated touch | 23 |
| 46-5341-90-EA | PDI-N assy, digital, low res, IGT, Netplex/isolated touch | 4 |
| 46-5342-90-EA | PDI-AN assy, digital, high res, IGT, Netplex/isolated touch | 1 |
| 46-5345-90-A | PDI-U assy, no MLD, single download | 55 |
| 46-5347-90-A | PDI-U assy, no MLD, dual download | 14 |
| 46-5349-90-A | PDI-U assy, MLD, vertical, dual download | 4 |
| 50-4358-90-EA | Firewall, Stonesoft, NGF-1035-C1A | 2 |
| 50-6525-00-EA | Kit, firewall, SonicWALL NSA 3500 | 3 |
| 50-6526-00-EA | Kit, firewall, SonicWALL NSA 250M | 12 |
| 50-6527-00-EA | Kit, firewall, SonicWALL TZ 210 | 3 |
| 50-6528-00-EA | Kit, firewall, SonicWALL TZ 205 | 4 |
| 50-6529-00-EA | Kit, firewall, SonicWALL NSA 240 | 4 |
| 80-2358-90-EA | Server, Mac Mini, 4 GB, MC815L/A | 1 |
| 80-4218-90-EA | Server, CSC, BBFM | 3 |
| 80-4317-90-EA | Server, RSC, Dell PowerEdge R420 | 1 |
| 80-4318-90-EA | Server, RSC, Intel, ATOM350-1G | 4 |
| 80-4319-90-EA | Server, RSC, Shuttle SZ68R5, 16GB | 3 |
| 80-4321-90-EA | Server, RSC, Supermicro, 5017C-TF 1U, 4 GB | 2 |
| 80-4322-90-EA | Server, RSC, Supermicro, 6016T-6F 1U, 8 GB | 2 |
| 80-4323-90-EA | Server, RSC, Supermicro, 5037A-T-1, 4 GB | 2 |
| 80-5268-90-EA | Server, CSC, HP, HPQ DL380R07 | 1 |
| 80-5270-90-EA | Server, Quixant, SmartTable | 1 |
| 90-1471-90-EA | Switch, Procurve 1410-24G | 3 |
| 90-5416-90-EA | Switch, Brocade FWS624G | 3 |
| 90-5418-90-EA | Switch, Brocade  ICX6430-24 | 10 |
| 90-5419-90-EA | Switch, Brocade ICX6450-24 | 1 |
| 90-5420-90-A | Switch, Brocade ICX6430-C12 | 16 |
| 90-5421-90-EA | Switch, Brocade ICX6430-24 | 1 |

SCHEDULE 1.1(F)
TRADEMARKS

| Registration Number | Application Number | Title | Filing Date | Issue Date | Expiration Date |
|---|---|---|---|---|---|
| 3922979 | 85080283 | SaffariNet | 7/8/10 | 2/22/11 | 2/22/21 |
| 4001192 | 85079485 | Leap Forward Gaming | 7/7/10 | 7/26/11 | 7/26/21 |
| 4072839 | 85149199 | Leap Forward (logo) | 10/10/10 | 12/20/11 | 12/20/21 |
| 4503381 | 85887841 | SmartTable | 3/27/13 | 3/25/14 | 3/25/24 |
| 4503382 | 85887901 | Patron Display Interface | 3/27/13 | 3/25/14 | 3/25/24 |
| 4172219 | 85-091379 | Shahrazad | 7/23/10 | 7/10/12 | 7/10/22 |
| 4576139 | 85-142582 | Smartfloor | 9/30/10 | 7/29/14 | 7/29/24 |

SCHEDULE 1.1(H)
PATENTS

| Patent Num. | Appl. Num. | Title | Priority | Issue Date |
|---|---|---|---|---|
| 8,083,592 | 12/943,792 | Apparatus and method for retrofitting candle devices on a gaming machine | 2/10/10 | 12/27/11 |
| 8,088,014 | 12/943,789 | Gaming device and method for wireless gaming system providing non-intrusive processes | 2/10/10 | 1/3/12 |
| 8,241,119 | 12/943,797 | Candle devices for gaming machines | 2/10/10 | 8/14/12 |
| 8,282,480 | 13/327,566 | Candle device for providing transaction verification on a gaming machine | 2/10/10 | 10/9/12 |
| 8,317,604 | 13/294,064 | Apparatus and method for retrofitting candle devices on a gaming machine | 2/10/10 | 11/27/12 |
| 8,336,697 | 12/943,798 | Device health monitoring for gaming machines | 2/10/10 | 12/25/12 |
| 8,371,937 | 13/300,344 | Gaming device and method for wireless gaming system providing non-intrusive processes | 2/10/10 | 2/12/13 |
| 8,460,091 | 13/086,218 | Remote power reset feature on a gaming machine | 2/10/10 | 6/11/13 |
| 8,479,908 | 13/671,394 | Device health monitoring for gaming machines | 2/10/10 | 7/9/13 |
| 8,696,430 | 13/890,692 | Device health monitoring for gaming machines | 2/10/10 | 4/15/14 |
| 8,696,449 | 13/738,774 | Gaming device and method for wireless gaming system... | 2/10/10 | 4/15/14 |
| 8,814,681 | 13/327,584 | Candle device for generating display interfaces... | 2/10/10 | 8/26/14 |
| 8,814,706 | 14/027,111 | Radio candle mount | 2/10/10 | 8/26/14 |
| 8,882,589 | 14/207,476 | Device health monitoring for gaming machines | 2/10/10 | 11/11/14 |
| 8,968,086 | 14/027,112 | Video processing and signal routing apparatus... | 2/10/10 | 3/3/15 |
| 9,022,861 | 14/320,250 | Device health monitoring for gaming machines | 2/10/10 | 5/5/15 |
| 9,245,419 | 14/710,549 | Lottery games on an electronic gaming machine | 2/10/10 | 1/26/16 |
| 9,240,100 | 14/043,724 | Method and apparatus for video display... | 2/10/10 | 1/19/16 |
| Pending | 14/608,149 | Video processing and signal routing apparatus ... | 2/10/10 | TBD |
| Pending | 14/949,982 | Lottery games on an electronic gaming machine | 2/10/10 | TBD |
| Published | 14/970,332 | Method and apparatus for video display... | 2/10/10 | TBD |

## SCHEDULE 1.1(I)
### THIRD PARTY ASSETS AND LICENSES

[*none*]

**SCHEDULE 2.2**
**ALLOCATION OF PURCHASE PRICE**

Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller a statement setting forth the allocation of Purchase Price required under Section 2.2 of the Agreement (the "Purchase Price Allocation"). The Purchase Price Allocation shall be prepared by an independent appraiser engaged by and at the expense of the Buyer.

## SCHEDULE 2.3
## EARN OUT EXAMPLES

| EARN-OUT CALCULATION: Example 1 | $ in mm |
|---|---|
| TVCR & LVS amounts invoiced | 25.0 |
| less minimum threshold | (2.5) |
| Earn-out basis | 22.5 |
| multiplied by: | 20% |
| Earn-out (unadjusted) | 4.5 |
| cap adjustment | - |
| Earn-out (capped at $6M) | 4.5 |
| + Upfront | 2.5 |
| = Total consideration | 7.0 |

| EARN-OUT CALCULATION: Example 2 | $ in mm |
|---|---|
| TVCR & LVS amounts invoiced | 35.0 |
| less minimum threshold | (2.5) |
| Earn-out basis | 32.5 |
| multiplied by: | 20% |
| Earn-out (unadjusted) | 6.5 |
| cap adjustment | (0.5) |
| Earn-out (capped at $6M) | 6.0 |
| + Upfront | 2.5 |
| = Total consideration | 8.5 |

## SCHEDULE 3.1
## ASSUMED LIABILITIES

[*none*]

**SCHEDULE 5.8**
**LICENSES**

| Type | Entity | Number | Date Issued | Through Date |
|---|---|---|---|---|
| Business License | City of Reno | 117570 | 9/01/2015 | 8/31/2016 |
| Business License | State of Nevada | NV20091081532 | 7/06/2015 | 7/31/2016 |
| M/1 Registration | Governo da Regiao Administrativa Especial de Macau | 82323800 | 6/20/2012 | N/A |
| Associated Equipment Manufacturer Registration | Nevada Gaming Control Board | 31459-01 | 3/31/2016 | 3/31/2017 |
| Temporary Supplier License | Michigan Gaming Control Board | 006884-T | 1/15/2015 | N/A |
| Vendor License | United Auburn Indian Community Tribal Gaming Agency | 14-00006 | 12/11/2014 | 12/01/2016 |

## SCHEDULE 5.10
## LITIGATION

**Case number:  2:15-cv-01842-APG-VCF**

Court:  US District Court, Nevada, Southern Division

Plaintiffs: International Game Technology and IGT

Defendants: Leap Forward Gaming, Inc., Mohammad Ali Saffari, Bruce Cunningham, Perry Cobb

**Case number:  CV15-02014**

Court: Nevada State Court, Second Judicial District, Washoe County

Plaintiff: Leap Forward Gaming, Inc.

Defendant: Andrew Novotak, Jr.

**Case number:  CV15-02420**

Court:  Nevada State Court, Second Judicial District, Washoe County

Plaintiff: Andrew Novotak, Jr.

Defendants: Leap Forward Gaming, Inc. and Mohammad Ali Saffari

**SCHEDULE 9.1**
**SELLER EMPLOYEES**

Aragon, Tim

Claypool, Cavour

Ford, Mike

Hostetler, Andrew

Korver, Kirk

Kovnot, Matthew

Paulsen, Craig

Quick, Tom

Smith, Bradley